**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-316-DLF** |
| **WILLIAM ROGAN REID,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. The government requests that this Court sentence William Reid to 78 months' incarceration, in the middle of the Sentencing Guidelines range as calculated by the government; three years of supervised release; $2,443 in restitution; and the mandatory $100 special assessment per count.

### I.    INTRODUCTION

"*I'm going to get into some trouble tomorrow*"

-William Rogan Reid, January 5, 2021

Reid was at the forefront of the Capitol Breach, a violent attack on the United States Capitol that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.8 million dollars' in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Reid came to the Capitol, not for a peaceful protest, but to "get into some trouble." Before the rally ended, Reid announced on social media that it was "time to storm the Capitol" and then did so. Reid broke barricades on the west side of the Capitol and occupied a set of stairs next to scaffolding set up for the Inauguration. While there, Reid helped other rioters to climb bike racks being used as make-shift ladders. When rioters broke through a police line under the scaffolding, Reid was at the front, among the first to rush up the steps. After briefly climbing the bleachers above the Inauguration platform, Reid entered the Capitol through a broken window. For over an hour, Reid walked through the Capitol, surged through police lines, led rioters through the building, and encouraged other rioters to enter. Eventually, Reid made his way towards the Speaker's Lobby and entered a nearby bathroom, where he damaged a television and watercooler. After Ashli Babbitt was shot near the Speaker's Lobby, Reid exited the bathroom and ran away from the area, later exiting the Capitol.

Reid has shown absolutely no remorse for his actions. To the contrary, in the days that followed, he called the attack "inspiring" and promised that he had "just gotten started." He bragged about being at the "very front line when we took the steps" and "out front of the initial breach." He described how the rioters "forced our way in, foot by foot" past police who were "overwhelmed." And he said he would never forget the fear he saw in the officer's eyes, claiming that the memory "fuels me now." For months after the attack, right up until his arrest, Reid continued to brag about his conduct and his desire for more violence. He promised that January 6 was "just the first f*cking battle" and that he would "f*cking do it again." And in a final act of obstruction, Reid disabled and hid his cellphone to keep its evidence from being used in the criminal investigation.

2

The government asks this Court sentence Reid to 78 months of imprisonment, in the middle of the applicable 70 to 87 month guidelines range, to reflect the gravity of Reid's conduct, his utter lack of remorse, and the need to deter him and others from similar conduct.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

### A.  The January 6, 2021, Attack on the Capitol

On January 6, 2021, hundreds of rioters, Reid among them, attacked the U.S. Capitol to disrupt the peaceful transfer of power after the November 3, 2020 Presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked the place—vandalizing, damaging, and/or stealing artwork, furniture, and other property. Although the facts and the circumstances of the actions of each rioter who breached the Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-CR-54 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As explained in the PSI and the Statement of Facts from Reid's trial (ECF No. 31), a joint session of Congress convened at around 1:00 p.m. at the Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By around 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police ("USCP") were present and attempting to keep the crowd away from the building and the proceedings underway inside. At about 2:00 p.m., certain individuals unlawfully forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to keep the crowd from entering, but shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At about 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at about 8:00 p.m. after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* ECF No. 31, at 5-7; PSI at ¶¶ 9-15.

### Injuries and Property Damage Caused by the January 6, 2021 Attack

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history,

raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.").

In addition, the rioters injured more than a hundred police officers. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). As set forth in the Statement of Offense, the attack resulted in substantial damage to the U.S. Capitol, requiring the expenditure of approximately $2.8 million. *See* ECF No. 31 at 6.

### Breach of the Capitol Building at the Senate Wing Door

One of the main breach points through which rioters entered the Capitol Building itself was an entryway on the west side of the Senate Wing, next to the Northwest Courtyard of the Capitol ("Senate Wing Door"). In Images 1 and 2 below, the Senate Wing Door is circled in red.



*Image 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525*



*Image 2: Screenshot from open source video depicting Senate Wing door as it appeared at about 2:13 pm on January 6, 2021*

About 1:48 p.m., rioters on the West Plaza broke through a police line at the base of the Northwest Scaffolding and climbed the steps underneath leading to the Upper West Plaza. Rioters under the Northwest Scaffolding were stopped temporarily by police, but at about 2:09 p.m., they

broke through and streamed up the stairs to the Northwest Courtyard. Many of these rioters headed straight towards the Senate Wing Doors.

About 2:13 p.m., one of the rioters broke the windows next to the Senate Wing Door using a stolen police riot shield. Rioters entered through those windows and opened the Senate Wing Door from the inside.


*Image 3: Screenshot from open source video*


*Image 4: Screenshot from USCP Security Footage*

Rioters began streaming into the building through the main door and the surrounding windows. Broken glass littered the ground, and a piercing alarm sounded, audible to anyone in the area.

8

**B.  Reid's Role in the January 6, 2021, Attack on the Capitol**

Reid played a prolonged role in the January 6 attack on the Capitol. His crimes are well documented through a variety of sources, including open-source video, security video, and his own admissions on social media.

Before the attack, Reid made clear he was not coming to Washington merely to protest. In a January 2, 2021, Instagram post, Reid asked if another user was going to Washington, and said "Lets *[sic]* raise some hell." *See* Exhibit 1, at 1.[2]  On January 5, Reid said he planned to "get into trouble tomorrow" and, alleging that the Georgia runoff election involved "rigging," promised that "[i]t begins tomorrow." Ex. 1, at 1. He traveled to Washington, D.C. by car on January 5 along with two other individuals. In the early morning hours of January 6, Reid announced that it was "Game time!!" and anticipated that "[t]omorrow is going to be a sh*tshow." Ex. 1, at 1.

Though he attended the former president's rally, Reid left before it was over, aware, as he later admitted, of rumors that the Proud Boys were fighting near the Capitol[3] and Reid understood that the former president gave the crowd the "green light" to march to the Capitol. Ex. 1, at 17.

As he walked towards the Capitol, Reid recorded and posted a video, superimposing the words "time to storm the Capitol" over it. *See* Exhibit 2.

---

[2] Exhibit 1 contains excerpts from Reid's posts to Instagram and Discord which were obtained through search warrants. Reid used various related usernames, including "blumpkin1776," "blumpkin76," "blumpkinshow," and "blumpkinvice." The time code on the posts is in coordinated universal time ("UTC"), which is four hours ahead of Eastern Daylight Time.

[3] The Proud Boys describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Proud Boys members routinely attend rallies, protests, and other events, some of which have resulted in violence involving members of the group.



*Exhibit 2 at :02*

When he arrived at the Capitol, Reid bragged to his Instagram followers that he had broken

a barricade: "so they put up a ton of barricades last night. We broke the barricade. We're on the

doorsteps right now. We're f*cking going in, all the way." *See* Exhibit 3.



*Exhibit 3 at :00*

From about 1 p.m. to 2 p.m., Reid was at the Northwest stairs, next to scaffolding which

had been set up for the inauguration. *See* Image 1 (purple circle). At various times, Reid was either

below or on top of a ledge in the area, chanting slogans such as "Four More Years!" and "F*ck These Tyrants!" *See* Exhibit 4.



*Exhibit 4 at :06*

While near the steps, Reid helped other rioters to use stolen bike racks as makeshift ladders to access the Northwest Stairs, and at one point, climbed a bike rack himself to hand a large piece of canvas to the rioters above him. *See* Exhibit 5.



*Exhibit 4 at 1:32*                    *Exhibit 5 at :26*



*Exhibit 5 at :34*

While in this area, Reid recorded another rioter, Guy Reffitt, confronting police on the Northwest Steps. *See* Exhibit 6.

Reid next moved under the scaffolding. While there, he saw rioters confronting police and yelling at them to "stand down." *See* Exhibit 7. Reid recorded video of himself saying, "We're on the footsteps of Capitol Hill. I'm right there, front lines. Fights are breaking out. Pepper-f*cking-spray everywhere . . . We're going. We're pushing all the way through." *See* Exhibit 8.



*Exhibit 8 at :14*

About 2:09 p.m., Reid ducked under a piece of scaffolding, raised his red gaiter over his face, and climbed the steps to join the front line of rioters who were confronting police midway up the Northwest Steps. *See* Exhibit 9.



*Exhibit 9 at :18*

Within less than a minute, rioters broke through the police line and rushed up the steps towards the Northwest Courtyard. Reid was among the first rioters through. *See* Exhibit 10.



*Exhibit 10 at :14*

At the top of the steps, Reid and other rioters confronted another police line at the Northwest Courtyard. Reid's video of the scene showed the bike racks temporarily holding the

13

rioters back. *See* Exhibit 11.

Soon, the rioters pushed over the bike racks and forced their way through the police line. Most rioters headed left, towards the Senate Wing Door. Reid headed right, towards the grandstand overlooking the inauguration stage. *See* Image 1 (yellow circle). Reid climbed the bleachers and called out to the rioters below, raising his fist in celebration. *See* Exhibit 12.



*Exhibit 12 at :01*

While at the top of the grandstand, Reid recorded a video celebrating his accomplishment, saying, "I'm on top of Capitol Hill right now. We broke through. We f*ckin' did it!" *See* Exhibit 13. Reid later admitted his goal in climbing the bleachers was to "get more people in" but then he saw the rioters approaching the Senate Wing Door and so he "ran back downstairs." Ex. 1, at 12. Reid left the grandstand and moved towards the Senate Wing Door, recording more video, proclaiming, "We're storming the f*cking Capitol. Promises kept. Yeah, you hear that sh*t? F*ck it." *See* Exhibit 14.

About 2:15 p.m., Reid entered the Capitol by climbing through a broken window to the right of the Senate Wing Door. *See* Exhibit 15. Reid immediately took out his cellphone to record

the scene before proceeding south, towards the Crypt, with his right hand raised in triumph.



*Exhibit 15 at :11*

Reid continued south, using his cellphone to record rioters fighting with police, carrying

stolen signs and flagpoles, and pushing through the police line into the Crypt. *See* Exhibit 16.



*Exhibit 16 at :10*

Once inside the Crypt, Reid moved to the front line of rioters facing the police. *See* Exhibit

17.

15



*Exhibit 17 at :32*

About 2:25 p.m., the rioters broke through the police line in the Crypt. *See* Ex. 17 at 1:35. Reid joined the rioters pushing towards the south entrance to the Crypt. *See* Exhibit 18. When the volume of rioters blocked passage through the south entrance, Reid moved west, and took a set of stairs up one level to the Rotunda. Reid briefly passed through the Rotunda and through Statuary Hall to the Statuary Hall Connector leading to the House Chamber.

Reid once again moved to the front line of rioters confronting police.



*Screenshot from Capitol security video at 2:28 pm*

About 2:36 p.m., the rioters broke through the police line at the Statuary Hall Connector and

16

pushed forward towards an entrance the House Chamber. *See* Exhibit 19 at :10. After about a minute, Reid broke off from the group and headed left down the hall.



*Exhibit 19 at 2:01*

Reid tried unsuccessfully to open one of the nearby offices and then entered the Rayburn Reception Room through an open door. *See* Ex. 19 at 2:01 - :22.



*Exhibit 19 CCTV 251 at 2:22*

Reid spent about two minutes inside, before emerging and encouraging other rioters to enter the Rayburn Room. *See* Ex. 19, at 4:51 – 5:15.

17



*Exhibit 19 at 4:51*

Reid reentered the room briefly, but emerged again, running to join a mass of rioters moving towards the Speaker's Lobby.



*Exhibit 19 at 5:48*

On his way to the Speaker's Lobby, Reid passed by the Senate Door to the west side of the Capitol. Reid saw rioters outside the door trying to get in. At first, he signaled them, encouraging them to enter the Capitol. *See* Exhibit 20.[4]  When it was clear the rioters could not open the doors from the outside, Reid ran to open the doors for them, and would have done so had not another rioter beaten

---

[4]  Exhibit 20 is a composite of excerpts from two Capitol security videos.

him to the door.



*Exhibit 20 at :12, :15*

When the door opened, allowing other rioters inside, Reid reversed course and ran back towards the Speaker's Lobby, raising his fist and encouraging others to follow.



*Exhibit 20 at :24*

Reid arrived at the Speaker's Lobby around 2:42 p.m. He entered a nearby bathroom and, confident that there would be no security cameras there, damaged a television and water cooler.

As Reid later described it,

> . . . just to be sure, even in the Women's House bathroom, even though they eliminated gender language, at her f*cking behest, by the way, I made sure to wipe the seat and everything, and I flushed, and I went to the sink and I wiped my hands and that's when the crowd started pouring in. I turn around, and there's a f*cking flat screen TV up on the wall, and AOC's donkey face is looking down on me, smiling. I lost my sh*t. I don't know what I picked up, 'cause there was, there was brushes, like these ornate, like golden, and it wasn't gold, but like brass f*cking brushes that they f*cking had in these vanities. It was one of those, or a f*cking remote or something, and I just picked it up, and I, like, overhanded it, and BAM!, I smashed the f*ck out of that TV. And, then, I destroyed the water cooler, and they probably have my fingerprints all over that sh*t, too. But whatever, I don't even give a f*ck at this point. So they can track these electronic communications, but, you know, maybe I'm lying, maybe I'm not, I don't f*cking know. But I know this, there's no f*cking cameras in those bathrooms. Just saying.

*See* Exhibit 21.[5] According to the Chief Administrative Officer of the House of Representatives, on January 6, 2021, both a television and a water cooler inside the bathroom next to the Speaker's Lobby door were damaged. The estimated replacement value of the television is $443. The water cooler was a rental and was replaced by the rental company.

At about 2:45 p.m., while Reid was still in the bathroom, rioter Ashli Babbitt was shot as she tried to break into the Speaker's Lobby. Reid exited the bathroom and ran away from the area, saying "they shot somebody." *See* Exhibit 22. According to Reid's later social media posts, he stayed in the Capitol until "around 3:30" *See* Ex. 1, at 8.

### C. Reid's Lack of Remorse

Reid did not regret his actions on January 6. Quite the contrary. In the days, weeks, and months after the riot, in his posts on Instagram and Discord, Reid expressed pride in his conduct

---

[5] Exhibit 21 is a composite of ten voice messages Reid posted to Instagram between about 3:04 a.m. and 3:07 a.m. on January 9, 2021. The government has redacted the responses to these messages.

and eagerly shared his videos and the details of the attack. He called the attack on the Capitol "inspiring" and "fun." *See* Ex. 1, at 3, 10. He compared attacking the Capitol to being a rock star in front of an adoring audience and described it as "a high I've never experienced before." *See* Exhibit 23. He deleted any of his followers who did not support the attack on the Capitol, calling them "cowards." *See* Ex. 1, at 5.

He proudly admitted that he wanted to "get into Congress" and that his purpose had been to "storm Congress and stop the certification." Ex. 1, at 10, 14. He boasted that he was "out front of the initial breach," and had been part of the "first wave" at the "very front line" of the rioters. Ex. 1, at 1, 4-5, 7. He bragged that he had jumped through a window that another rioter had broken using a police shield, and was proud that he had been pepper sprayed "multiple times." Ex. 1, at 4, 9, 13, 17. He wanted people to know that the attack had not been conducted by Antifa or BLM, but by "MAGA people." Ex. 1, at 4-5, 13-14. He claimed he and Ashli Babbitt had led the rioters up the steps, bragged about how close he was to her, joked about her, and expressed anger at the investigation into the officer who fired on her. Ex. 1, at 2, 9, 11, 18-19.

Reid relished the fact that the police had been victimized on January 6. He made clear that the police had not let the rioters into the Capitol and proudly proclaimed that he and the other rioters had "bumrushed" the police, "pushed for every inch," and forced their way in "foot by foot." Ex. 1, at 3, 12-13. He said he would never forget the "fear" he saw in the eyes of the "overwhelmed" police, and that the memory "fuels" him now. Ex. 1, at 15-16.

Reid also made clear that he eagerly anticipated more violence. On January 7, he posted that he was "just getting started." Ex. 1, at 6. On January 9, Reid claimed "we won DC," Ex.1, at 15, and promised that the attack on the Capitol was merely the "first f*cking battle":

21

> I made the decision to go in there. We're in a f*cking war, and I'm not gonna f*cking hide. If I'm gonna have to retreat for a little bit, gather, and f*cking counter-attack, that's what I'm gonna do, but, I'm not gonna leave my destiny up to the court and hope that things work out in good faith. F*ck that. . . . The war just started. Wednesday was just the first f*cking battle.

*See* Exhibit 24. On February 26, he posted that "[t]he 6th was the beginning but hardly the end." Ex. 1, at 21. On February 28, he sent a voice message over Instagram threatening to kill anyone who "singled out" him or his family, boasting "I am a violent motherf*cker. I'm a peaceful motherf*cker, but I use violence as a means to accomplish peace." *See* Exhibit 25. On March 3, Reid posted "I rushed on the 6th and I'd do it again." Ex. 1, at 21. On March 7, Reid posted a video with the words "domestic terrorism" super-imposed in which he addressed law enforcement, saying "prison would be fun, but you're not going to incarcerate me, motherf*ckers. The 6th was a warning." *See* Exhibit 26.



*Exhibit 26 at :07*

On March 8, Reid posted "I'm going 6th on steroids. The sequel. Real soon." Ex. 1, at 22. The same day, he said his only regret had been that "we surrendered that building." Ex. 1, at 23.

On March 11, in a Discord post, Reid analogized himself to those who fought the American Revolution, claiming that "[t]he 6th was our Boston Tea Party" and "there are no more political solutions" Ex. 1, at 23. On March 25, Reid posted "only direct confrontation wins the day," and responded to the comment "The future of our country will be written in our blood" with "Let it be then." Ex. 1, at 26.

Reid's violent rhetoric included expressions of a desire to kill minorities and political opponents as well as threats against law enforcement. On January 12, he promised that he would not "sit[] behind bars for standing up for our rights" and that "[t]hey'll have to kill me." Ex. 1, at 18. On January 14, referring to political opponents, he posted that his "urge to do violent things to these people keeps growing." Ex. 1, at 18. On January 30, Reid delivered a tirade about minorities and political opponents, promising to "kill 'em all" because "they all deserve to die" and claiming that he would be "Hitler on steroids." *See* Exhibit 27.[6] Reid promised to "eliminate their entire f*cking bloodline" and swore that he would "not rest" until they were all "marched into ovens" and he saw their "last breath escape their f*cking empty shells of bodies." *Id*. The same day, Reid bragged about having "smashed the face" of a "Goldberg looking motherf*cker" and said, "I can't beat enough faggot liberals." Ex. 1, at 20. On March 13, Reid posted a message to law enforcement: "I rushed the Capitol. Hi, Feds" along with a meme stating, "I'll f*ckin do it again." Ex. 1, at 23-24. On March 24, Reid posted that he loved "the fact the feds are after my ass," calling them a "Bunch of f*cking frauds." Ex. 1, 25. The same day, still referring to law enforcement, Reid posted "I won't go Kacynski *[sic]*, but I'm one guy they don't want to back into a corner," followed by

---

[6] Exhibit 27 is a collection of sequential audio recordings Reid posted to Instagram on January 30, 2021. The government has redacted the responses.

"I'm going to buttf*ck the FBI." Ex. 1, at 25.[7]

**D. Reid's Obstruction of Justice**

Having often bragged on social media that he was wanted by the FBI, late on March 31, 2021, Reid asked some Discord followers to participate in an "April Fools joke" in which he would pretend to have been arrested. Reid claimed that this would "confuse the f*ck out of the feds watching me already" and be "a prank on the FBI more than anything." Ex. 1, at 27-29. As part of the "joke," close to midnight on March 31st, Reid posted on Instagram, "F*ck, cops outside. Alright boys, wish me luck. Lots of vehicles. Destroying phone now." Ex. 1, at 29. Reid's reference to destroying his cellphone as part of the "joke" demonstrated his understanding that his cellphone contained material evidence of his crimes on January 6th.

Unbeknownst to Reid, FBI agents were planning to execute a recently obtained arrest warrant the next day. On April 1, 2021, at about 6:13 a.m., the FBI arrived at Reid's house and announced their presence. A few minutes later, having previously obtained a search warrant for location data on Reid's phone, the FBI received a signal indicating the phone had been turned off or was out of service. Reid did not exit the house until around 6:30 p.m., at which time he was arrested. When advised that the agents had a search warrant which extended to electronic devices, Reid first claimed that he had left his cellphone at a friend's house but later claimed that he did not know where the cellphone was.

Upon entry, law enforcement officials observed that his house was filled with an excessive accumulation of items, consistent with a persistent refusal to discard or part with possessions.

---

[7] Ted Kaczynski, otherwise known as the Unabomber, is an American domestic terrorist who killed three people and injured 23 others with explosives.

Inside Reid's bedroom, law enforcement found a charger for Reid's cellphone, and searched the rest of the residence for Reid's cellphone, but due to the condition of the house and volume of materials in each of the rooms, could not find it.

Reid has admitted that after law enforcement arrived, he disabled and hid his cellphone with the intent to impair its availability for use in his own criminal case and the ongoing investigation into the January 6, 2021 attack. *See* ECF No. 31, ¶ 25.

### III.    THE CHARGES AND VERDICT

On March 26, 2021, Reid was charged by complaint with Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

On April 1, 2021, Reid was arrested in Florida and detained.

On April 11, 2021, a federal grand jury returned an indictment charging Reid with the same violations alleged in the complaint, and also charging Reid with Corruptly Altering, Destroying, Mutilating, or Concealing a Record, Document or Other Object, in violation of 18 U.S.C. § 1512(c)(1).

On July 28, 2021, a federal grand jury returned a superseding indictment charging Reid with the same violations alleged in the original indictment, and also charging Reid with Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2, and Destruction of Government Property, in violation of 18 U.S.C. § 1361.

On August 23, 2022, Reid was convicted on all counts of the superseding indictment at a

bench trial on stipulated facts.

## IV.    STATUTORY PENALTIES

Reid now faces sentencing on all seven counts. As noted by the U.S. Probation Office, the statutory maximum term of imprisonment is 20 years on each of Counts One (Obstruction of an Official Proceeding) and Seven (Corruptly Altering, Destroying, Mutilating, or Concealing a Record, Document or Other Object); one year on each of Counts Two (Destruction of Government Property), Three (Entering and Remaining in a Restricted Building or Grounds), and Four (Disorderly and Disruptive Conduct in a Restricted Building or Grounds); and six months on each of Counts Five (Disorderly Conduct in a Capitol Building) and Six (Parading, Demonstrating, or Picketing in a Capitol Building).

The maximum fine for Counts One and Seven is $250,000; for Counts Two, Three and Four is $100,000; and for Counts Five and Six is $5,000. PSI ¶¶ 144-46.

The maximum terms of supervised release are three years for Counts One and Seven; and one year for Counts Two, Three and Four. PSI ¶¶ 122-123.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual

sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

### 1.    Guidelines Analysis for Each Count

The government agrees with the Sentencing Guidelines calculation set forth in the PSI, and analyzes the guidelines for each count as follows:

**Count One: 18 U.S.C. § 1512(c)(2) and § 2—obstructed and aided and abetted the obstruction of an official proceeding before Congress**

| Base offense level: | 14 | U.S.S.G. §2J1.2(a) |
|---|---|---|
| Special offense characteristic | +8 | U.S.S.G. §2J1.2(b)(1)(B): "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." |
| Special offense characteristic | +3 | U.S.S.G. §2J1.2(b)(2): "the offense resulted in substantial interference with the administration of justice." |
| Adjustment | +2 | U.S.S.G. §3C1.1, cmt. n.4(D) ("destroying or concealing . . .evidence that is material to an official investigation or judicial proceeding"). |
| Total | 27 | |

**Count Two: 18 U.S.C. § 1361 – damaging government property**

| Base Offense Level: | 6 | U.S.S.G. §2B1.1(a)(2) |
|---|---|---|
| Special offense characteristics | 0 | The value of the damaged property was under $6,500. U.S.S.G. § 2B1.1(b)(1)(A). |
| Adjustment | +2 | U.S.S.G. §3C1.1, cmt. n.4(D) (obstructing administration of justice): "directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding . . . or attempting to do so" |
| Total | 8 | |

**Count Three: 18 U.S.C. § 1752(a)(1)—entering and remaining in a restricted area**

| Base Offense Level: | 4 | U.S.S.G. §2B2.3(a) |
|---|---|---|
| Special offense characteristic | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." |
| Cross Reference | | U.S.S.G. §2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in |

| | | respect to that felony offense, if the resulting offense level is greater than that determined above." |
|---|---|---|
| Base Offense Level (adjusted) | 25 (from Count One) | U.S.S.G. §2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." |
| Adjustment | +2 | U.S.S.G. §3C1.1, cmt. n.4(D) ("destroying or concealing . . .evidence that is material to an official investigation or judicial proceeding") |
| Total | 27 | |

**Count Four: 18 U.S.C. § 1752(a)(2)—disorderly or disruptive conduct in a restricted area**

| Base Offense Level: | 4 | U.S.S.G. §2A2.4(a) |
|---|---|---|
| Total | 10 | |

**Counts Five and Six: disorderly or disruptive conduct, and parading, demonstrating and picketing in a Capitol Building**

| Base Offense Level: | n/a | Because these offenses are Class B misdemeanors, the Guidelines do not apply. See 18 U.S.C. § 3559; U.S.S.G. § 1B1.9. |
|---|---|---|

**Count Seven: 18 U.S.C. § 1512(c)(1)— obstruction of justice by altering, destroying, mutilating, or concealing a record, document, or other object**

| Base Offense Level: | 14 | U.S.S.G. §2J1.2(a) |
|---|---|---|
| Special offense characteristic | +2 | U.S.S.G. §2J1.2(b)(3)(B): the offense "involved the selection of any essential or especially probative record, document, or tangible object, to destroy or alter." |
| Cross Reference | | U.S.S.G. §2J1.2(c): "If the offense involved obstructing the investigation or prosecution of a criminal offense, apply § 2X3.1 (Accessory After the Fact) in respect to that criminal offense, if the resulting offense level is greater than that determined above." |
| Base Offense Level (adjusted) | 21 (from Count One) | U.S.S.G. §2X3.1(a)(1): "6 levels lower than the offense level for the underlying offense." |
| Total | 21 | |

    **2.    Grouping Analysis**

Under U.S.S.G. §3D1.2(a) and (c), "closely related counts" group. Counts One through

Four and Seven should be placed into one group, because they all involve the same victim and the same act or transaction and, in the case of Count Two, they embody conduct treated as a specific offense characteristic in the guideline applicable to another count. Specifically, the destruction of property charged in Count Two is embodied in the 8-level increase in the offense level for Count One pursuant to U.S.S.G. § 2J1.2(b)(1)(B): "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice."

The highest offense level for the group is 27 (for Count One).

### 3. No Adjustment for Acceptance of Responsibility Applies

Months after his participation in the attack on the Capitol, Reid committed the separate offense charged in Count Seven by disabling and hiding his cellphone with the intent to prevent the FBI from using its contents as evidence against him, or against anyone else in its ongoing investigation of the events of January 6. Reid's Count One conduct of obstructing Congress was "the offense with respect to which the obstructive conduct" in Count Seven "occurred." As a result, the adjustment under § 3C1.1 for obstruction of justice applies.

When a court imposes an adjustment under § 3C1.1, "the Guidelines state that an adjustment for acceptance of responsibility 'ordinarily' is not available." *United States v. Dozier*, 162 F.3d 120, 127 (D.C. Cir. 1998). While the Guidelines recognize that there may be "extraordinary cases" in which both §§ 3C1.1 and 3E1.1. apply, *see* U.S.S.G. § 3E1.1, cmt. n. 4, a defendant bears the burden of proving that his case is "extraordinary." *See United States v. Gonzales*, 12 F.3d 298, 300 (1st Cir. 1993). To determine whether a case is "extraordinary," a court should consider:

the totality of the circumstances, including the nature of the obstructive conduct

and the degree of acceptance of responsibility. Among other things, the district court should [consider] whether, for example, the obstruction of justice was an isolated incident early in the investigation or an on-going effort to obstruct the prosecution. It should [consider] whether [the defendant] voluntarily terminated his obstructive conduct, or whether the conduct was stopped involuntarily by law enforcement. The district court should [note] whether [the defendant] admitted and recanted his obstructive conduct, or whether he denied obstruction of justice at sentencing.

*United States v. Honken*, 184 F.3d 961, 968-69 (8th Cir. 1999).

Reid's case is not "extraordinary." First, Reid has demonstrated nothing like "extraordinary" acceptance of responsibility. "A defendant must earn an adjustment for acceptance of responsibility by performing positive actions that counter his negative ones." *Id*. at 973. Reid has not performed any "extraordinary" positive actions. While some January 6 defendants turned themselves in or pleaded guilty shortly after arrest, Reid did not agree to a stipulated bench trial until 17 months after his arrest. While some January 6 defendants have offered to speak with law enforcement about the events of that day, Reid never has. Though Reid stipulated to facts which formed the basis for his convictions, his admission to acts recorded on video and evidenced by his own social media posts is hardly "extraordinary." *See United States v. Thomas*, 97 F.3d 1499, 1501 (D.C.Cir.1996) ("There is a difference between admitting the acts and accepting responsibility for the crimes.").

Second, Reid's obstructive conduct was not a panicked response to an unexpected situation. His decision to disable and hide his phone was premeditated and purposeful. Reid knew that he was being investigated for his conduct at the Capitol and repeatedly expressed contempt for the FBI. Reid's "joke" about destroying his cellphone was aimed at law enforcement as much as his friends, and demonstrates his understanding that it contained incriminating evidence.

Third, Reid's obstruction is active and ongoing. Unlike a defendant who destroys evidence and can never recover it, Reid knows where his cellphone is hidden. If at any point after his arrest Reid had truly accepted responsibility and felt remorse for his conduct, he could have told law enforcement where the phone is hidden. The persistence of his obstructive conduct contradicts a true acceptance of responsibility. *See United States v. Hopper*, 27 F.3d 378, 383 (9th Cir. 1994) ("a defendant should never receive an offense level reduction for acceptance of responsibility when there is obstructive conduct contradicting that acceptance of responsibility").

The U.S. Probation Office calculated Reid's criminal history as a category I, which is not disputed. *See* PSI ¶ 69. Accordingly, the U.S. Probation Office calculated Reid's total offense level at 27, and his corresponding Guidelines imprisonment range at 70-87 months. *See* PSI ¶ 119.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). As described below, the Section 3553(a) factors warrant incarceration.

### A.   Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile forces. By its very

nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual who participated in the riot did so under the most extreme of circumstances, to which their conduct directly contributed. When looking at a defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help place each individual defendant on a spectrum as to their fair punishment.

Unlike many rioters, Reid entered the Capitol Building. He was one of the earliest rioters to do so, entering through a broken window next to the Senate Wing Door. While Reid did not engage in violence against police, he did engage in violent acts of destruction against property. Before he entered the Capitol, he actively helped other rioters to scale the walls. Once inside, he led other rioters through the building and directed them to open rooms, and also encouraged others to enter the building. He was inside the Capitol for over an hour, far longer than most, and at every opportunity, he occupied the front line of rioters confronting police. And Reid's response to the violence and destruction he saw around him was not horror or regret, but joy and satisfaction.

Unlike many other rioters, Reid destroyed evidence of his and others' crimes by disabling and hiding his cellphone. And unlike many other rioters, Reid has never offered to cooperate with law enforcement.

Reid's lack of remorse, reflected in his statements on social media, bears special mention. His social media posts, a small sample of which are included in Exhibit 1, show not only his intent to cause "trouble" on January 6, but also a complete lack of remorse for his conduct, an indifference to the violence he saw, and an eagerness to repeat his criminal conduct. Just after the riot, he posted on Instagram that the riot had been "inspiring" and "fun." He boasted about having been at "the very front," fighting "for every inch," and about how the "MAGA people broke the lines." He recounted having "bumrushed" the "overwhelmed" police, and how the memory of the "fear in their eyes . . . fuels me now." He sought to enhance his reputation by bragging about how close he had been to Ashli Babbitt.

Long after the riot was over, Reid continued to brag about his conduct and promise future violence. He said his only regret was "that we surrendered that building." He revealed that his "urge to do violent things to these people keeps growing," that "there are no more political solutions," and that "[t]he future of our country will be written in our blood." He posted that January 6th was "just the beginning" and that he would "f*ckin' do it again." He said he "love[d] the fact the feds are after my ass" and that he would "buttf*ck the FBI."

Reid was part of a riot that successfully shut down the certification of the electoral vote count for several hours, as members of Congress and their staff were forced to take shelter from the violence. He was at the "very front line" of a mob that injured hundreds of police officers, traumatized staff and members of Congress, and caused the loss of life. And he personally took

part in the wanton destruction of government property, contributing to the over $2.8 million in damage caused by the riot.

Although filled with pride for his participation in the riot, Reid was reluctant to face the consequences of his actions. As soon as law enforcement arrived at his residence, Reid disabled and hid his cellphone because he knew it contained incriminating evidence.

### B.     The History and Characteristics of the Defendant

While Reid, age 37, does not have any criminal history points, he does have a criminal history. Most concerning, from age 24 through the present, his record is filled with domestic violence complaints. *See* PSI ¶¶ 76-83. While none of these complaints led to convictions, the fact remains that a number of different women, including the mother of Reid's child, have felt the need to contact the police and/or seek protection orders based on Reid's violent and threatening conduct. At a minimum, the court should consider this history for what it says about Reid's propensity for violence and lack of respect for the law.

On social media, Reid claimed that the mere sight of a female politician on a television screen threw him into a fit of rage during which he attacked property inside a bathroom. *See* Ex. 21. And at the time of the riot, Reid was on bond for a state charge of Aggravated Stalking against a female victim. *See* PSI ¶ 85. The PSI sets out the disturbing allegations against Reid, much of which is evidenced by recorded video and text messages. *Id*.

Because of that pending charge, Reid's travel to Washington, D.C., was a violation of his bond conditions, a small demonstration of the disrespect for the law that he would show on January 6. Nor was this the first time Reid has violated court orders. Reid failed to comply with his financial obligations and failed to complete community service as required by his 2005 conviction, and his

probation in that case terminated unsuccessfully. *See* PSI ¶ 67. The affidavit underlying Reid's pending Aggravated Stalking charge also notes his violation of a prior injunction for protection against stalking violence – another court order Reid has disobeyed. *See* PSI ¶ 85.

Reid has also disobeyed court orders to pay child support. In 2016, Reid was held in contempt in a child support proceeding to which he did not appear, despite notice (ECF No. 33-1). In 2018, Reid was again held in contempt after a hearing which he did attend, and in which the court found that he had failed to pay as ordered despite having the ability to pay (ECF No. 33-2). As of November 7, 2022, Reid owes about $44,000 in court ordered child support, and has not made a child support payment since April 2018 (ECF No. 33-1). The record also shows no adjustment in the monthly child support obligation owed by Reid during the period from 2014 to 2016, casting doubt on Reid's claim that he was a "stay-at-home father" during that time (ECF No. 33-1).

Similarly questionable is Reid's claim to have no assets, "including cryptocurrency." PSI ¶ 111. On social media, Reid claims to own a large amount of cryptocurrency called "dogecoin" which he views as a "longterm hold." *See* Ex. 1 at 30-31.

Unlike some defendants, Reid cannot blame a difficult childhood for his violent tendencies or his criminal conduct. Reid had a "great childhood," was never abused, and is close with his family members (PSI ¶ 92).

At the time of his arrest, Reid was unemployed. He appears to have devoted much of his time to his social media presence, including not only the Instagram accounts described above, but also a Discord server which included entire discussion groups devoted to Jews ("[Jewish Star emoji]-transit-camp"), African-Americans ("joggers") and "white-trash."

35



*Image from Reid's Discord Server*

In March 2021, Reid claimed to have a "dedicated cult" following on social media consisting of about 2,000 people. *See* Ex. 1, at 22. Review of the search warrant returns for four of Reid's Instagram accounts suggest this is an underestimate. Reid's "blumpkin1776" account alone lists over 4,200 followers. Reid's social media efforts thus provided forums in which Reid and many others could share conspiracy theories, racial slurs, calls for violence, and challenges to law enforcement. *See e.g.*, Ex. 1 at 6-8, 19, 21, 25-26. While Reid has an absolute right to express his beliefs, the Court must also take Reid's violent statements into account when assessing his "history and characteristics" and determining his likelihood of engaging in future criminal conduct.

For all of these reasons, Reid's history and personal characteristics support the recommended sentence.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[8] As with the nature and circumstances of the offense, this factor supports a significant sentence of incarceration. Before arriving at the Capitol, Reid was already expressing a desire for chaos. As Reid pushed through police lines again and again as he made his way through the Capitol, it was abundantly clear to him that lawmakers, and the law enforcement officers trying to protect them, were under siege by rioters engaged in a civil disorder. Law enforcement officers were overwhelmed, outnumbered, and in some cases, in serious danger. But Reid gleefully took part in the attack. As this Court has noted, "those who stormed the Capitol . . . are not patriots, they are a direct threat to our democracy and will be punished as such." *United States v. Reffitt*, Case No. 21-CR-32, ECF No. 175, at 173.

This factor requires a significant sentence of imprisonment. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that crimes against police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

---

[8] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

**D.**     **The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this Reid. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[9] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [Reid] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

*United States v. Paul Hodgkins*, 21-cr-188-RDM, ECF No. 36 at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

---

[9] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

The need for general deterrence is particularly urgent for crimes arising out of January 6th. The threat of future political violence is not merely theoretical. As Judge Berman Jackson recently noted, "The heated, inflammatory rhetoric that brought the defendant to the district has not subsided . . . the lie that the election was stolen or illegitimate is still being propagated . . . and some prominent figures . . . are cagily predicting or even outright calling for violence in the streets" if Former President Trump is charged with a crime. *See United States v. Young*, 21-cr-291-ABJ, ECF No. 170, at 61-62. And too many agree with Reid that "there are no more political solutions." Ex. 1, at 23.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration. Reid stands out from many of the January 6 defendants not only in his lack of remorse, but in his post-riot violent rhetoric, his lack of respect for the law, and his history of domestic violence complaints and violating court orders. In light of Reid's actions to date, his express promises to commit similar crimes in the future cannot be written off as mere bravado.

The government requests a sentence significant enough to deter Reid from ever again using

force or violence in pursuit of his political beliefs.

**E.      The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens

of thousands of sentences and worked with the help of many others in the law enforcement

community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita*, 551 U.S.

at 349. As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in

the interests of greater rationality, avoiding inconsistency, complying with congressional

instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. §

994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on

empirical data and national experience, guided by professional staff with appropriate expertise,'"

and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at

108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the

Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing
> Commission's in-depth research into prior sentences, presentence investigations,
> probation and parole office statistics, and other data. U.S.S.G. § 1A1.1, intro,
> comment 3. More importantly, the Guidelines reflect Congress's determination of
> potential punishments, as set forth in statutes, and Congress's on-going approval of
> Guidelines sentencing, through oversight of the Guidelines revision process. *See* 28
> U.S.C. § 994(p) (providing for Congressional oversight of amendments to the
> Guidelines). Because the Guidelines reflect the collected wisdom of various
> institutions, they deserve careful consideration in each case. Because they have
> been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both*

determine that the Guidelines sentences is an appropriate sentence for the case at hand, that

sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary'

40

requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines provide the most helpful benchmark. As this Court knows, the government has charged many persons with crimes based on the January 6 riot, including hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will – the same Congress that served as a backdrop to this criminal incursion – the Guidelines will be a powerful driver of consistency and fairness moving forward.

## F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being

41

asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

42

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

While no previously sentenced case contains the same aggravating factors present here (and the Government submits that there are in fact no mitigating factors), the Court may consider the sentence imposed in *United States v. Reffitt*, 1:21-cr-0032 (DLF). As the Court is aware, Reffitt was convicted after trial on five felony counts, including both Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2), and Obstruction of Justice, in violation of 18 U.S.C. § 1512(a)(2)(c). There are many similarities between the two cases. Like Reid, Reffitt was a leading participant in the riot, among the first to confront police on the Northwest stairs. Like Reid, Reffitt announced his intent to attack the Capitol before his actions, encouraged other rioters, and posted comments after the riot showing a complete lack of remorse and discussing future violence. Neither Reffitt nor Reid had any criminal history points, neither were entitled to an acceptance of responsibility reduction, and neither Reid nor Reffitt engaged in any physical attacks on police officers. And, like Reid, Reffitt obstructed justice after the fact.

One distinction between the cases is that Reffitt wore protective gear and carried a weapon, though Reffit did not use the weapon. And Reid's conduct was more egregious than Reffitt's in that Reid actually entered the Capitol and, unlike Reffitt, Reid personally destroyed property.

Having determined that Reffitt's total offense level was 29, and his guideline range was 87 to 108 months, this Court sentenced Reffitt to 87 months of imprisonment. As noted above, Reid's total offense level is 27, and he faces a guideline range of 70 to 87 months. Accordingly, a mid-

guideline range sentence of 78 months of imprisonment would not create an unwarranted sentencing disparity.

**G.      Reid's Sentence Should Run Consecutive To His Anticipated State Sentence**

As noted, Reid has a pending charge of Aggravated Stalking in Florida State Court. PSI ¶ 85. Reid's counsel has previously indicated that he plans to plead guilty to that charge after sentence in this case is imposed.

This Court has discretion to order that Reid's sentence here run consecutively to any anticipated state sentence. *See Setser v. United States*, 566 U.S. 231, 236 (2012) (holding that a federal district court retain discretion to order that a federal sentence run consecutively or concurrently "where a federal judge anticipates a state sentence that has not yet been imposed."). This decision is guided by 18 U.S.C. §§ 3584(a) and (b), which state that "[m]ultiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently" and that "[t]he court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a)."

The government submits that under these principles, and based on the discussion above, Reid's sentence should be imposed consecutively to his anticipated sentence in the Florida case. The conduct underlying the Florida case predates and is completely unrelated to his federal crimes, and permitting Reid's sentence here to run concurrently with his anticipated sentence in Florida would diminish the seriousness of his conduct in both cases, and undermine the goals of promoting respect for the law, affording adequate deterrence, and providing just punishment.

44

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[10] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).

Most of the January 6 defendants have been ordered to pay $2,000 in restitution based on plea agreements. While there is no agreement here as to restitution, the government submits that an appropriate restitution amount is $2,443. That figure reflects in part the role Reid played in the riot on January 6 as well as the specific cost of the damage Reid did to property.[11]  Reid's restitution payment should be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 153.

---

[10] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[11] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## <u>CONCLUSION</u>

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 78 months incarceration, three years of supervised release, restitution of $2,443, and the mandatory $100 special assessment per count.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:     */s/   Robert Juman*
ROBERT JUMAN
Assistant United States Attorney
Bar No. NJ 033201993
United States Attorney's Office, Detailee
555 Fourth Street, N.W.
Washington, DC 20530
Phone: (786) 514-9990
E-mail: Robert.juman@usdoj.gov