**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Crim. Action No. 21CR316(DLF) |
| WILLIAM REID, | |
| Defendant. | |

## MEMORANDUM IN AID OF SENTENCING

William Reid will be before the Court for sentencing on December 7, 2022, having accepted full responsibility for his conduct at the U.S. Capitol on January 6. Mr. Reid has admitted that he had no business going inside the building and that it was wrong to think—no matter what political leaders had said—that delaying the vote certification was justified because the election had been "stolen." He has admitted that while at the Capitol and afterward, he posted divisive and incendiary comments online. Finally, he has admitted that the persona that he had created on social media does not reflect what his core beliefs are, who he is, and who he strives to be. He has reflected on his conduct and has expressed his contrition in his letter to the Court. Mr. Reid accepts his punishment for what he did that day.

That said, the Pre-Sentence Report (PSR) guideline range is excessive and Mr. Reid's conduct, while regrettable, is nowhere near warranting the 78-month sentence the government requests. Mr. Reid did not travel to the Capitol with weapons or a plan to commit violence. He did not travel with or act in concert with any extremist groups. He was not one of the first to breach the building. Once at the Capitol, he did not engage

in physically violent conduct and he did not threaten, assault, or injure anyone. And yet, the government is requesting a sentence higher than those imposed on defendants who assaulted and injured police officers on January 6 and during other large-scale protests which took place during the summer of 2020. The government's request for such a draconian sentence appears to be based largely on the words—admittedly, reprehensible words—that Mr. Reid posted online, shouting into the void, with no reason to believe that anyone would act based on his words. In our criminal legal system, we punish people for their actions, not for their use of attention-seeking rhetoric. And in looking at Mr. Reid's actions, counsel respectfully submits that the government's request—as well as the PSR's guideline range—substantially exaggerates Mr. Reid's conduct.

Pursuant to 18 U.S.C. § 3553(a), Rule 32 of the Federal Rules of Criminal Procedure, and Section 6A1.3 of the advisory United States Sentencing Guidelines ("USSG"), Mr. Reid states that he has reviewed the PSR and offers the following objections: First, he should receive an adjustment for his unequivocal acceptance of responsibility under § 3E1.1. Second, the PSR wrongly assesses a total 11-level increase under § 2J1.2 even though Mr. Reid's conduct did not involve the substantial interference with the "administration of justice" nor was it intended to interfere with the administration of justice.

Therefore, Mr. Reid respectfully submits that the correctly-calculated offense level is 14, resulting in a guideline range of 15-21 months[1]. Application of the

---

[1] Under §3D1.1(b), Counts One and Four group. Under the applicable guideline—2J1.2—the base offense level is 14. Mr. Reid receives a 2-level reduction for acceptance

sentencing factors demonstrate that a sentence of no more than 18 months is sufficient but no greater than necessary to achieve the goals of sentencing.

## I.     **Procedural History**

Mr. Reid was arrested on April 1, 2021, at his home and charged by complaint with various offenses arising out of his participation in the events at the Capitol on January 6. He appeared for his initial appearance via video-teleconference on April 23, 2021, and an Indictment was filed on April 23, 2021. Because he was then detained on local charges, he did not appear in this District until July, 2022. He did not contest his detention in this matter. Though he was not present in this District, he had been consistently communicating with his prior counsel[2] his willingness to accept responsibility and resolve the matter expeditiously.

Shortly after arriving in the District, Mr. Reid entered into a stipulated trial agreement whereby he accepted responsibility for each and every offense with which he

---

of responsibility and a 2-level increase under § 3C1.1, resulting in a total offense level of 14.

[2] Undersigned counsel noticed her appearance in this case on June 9, 2022. It is worth noting that pursuant to the government's original plea offer, the government agreed that Mr. Reid should be afforded a three-level reduction under U.S.S.G § 3E1.1 for his acceptance of responsibility. It was only after undersigned counsel indicated that Mr. Reid wished to maintain his appeal rights as to the obstruction count—as many other January 6 defendants have reasonably requested in light of the pending appeal of that count—that the government indicated that it would oppose a reduction for acceptance of responsibility. As discussed, *infra*, this change in the government's position is inconsistent with the position it has taken in other January 6 cases in which defendants have entered into stipulated trial agreements and internally inconsistent with its earlier position in Mr. Reid's case.

was charged, while maintaining his right to appeal his conviction for obstruction of justice (count 1).[3]

## II.    Objections to the PSR

### i.    The PSR incorrectly applied the U.S.S.G. §2J1.2 specific offense characteristics.[4]

The PSR added eleven levels to Mr. Reid's total offense level for two instances of interference with the "administration of justice" under U.S.S.G. §2J1.2(b). For the reasons set forth in the Honorable Judge McFadden's opinion on this issue[5], the application of these enhancements is a legal error and factual error.

The relevant specific offense characteristics provide as follows:

> If the offense involved causing or threatening to cause physical injury to a person, or property damage, *in order to obstruct the administration of justice*, increase by 8 levels.

U.S.S.G. §2J1.2(b)(1)(B) (emphasis added).

> If the offense resulted in substantial interference *with the administration of justice*, increase by 3 levels.

---

[3] As the Court is by now well aware, the Honorable Judge Nichols held that Mr. Reid's admitted conduct on January 6 cannot qualify as conduct that "otherwise obstructs, influences, or impedes" an official proceeding, within the meaning of Section 1512(c)(2) because it did not involve the destruction of evidence or documents. The government has appealed Judge Nichols's opinion in *United States v. Miller*, 1:21-CR-119 (CJN), 2022 WL 823070 (D.D.C. March 7, 2022)

[4] Undersigned counsel is aware that this Court applied the administration of justice enhancements in *United States v. Reffitt*, 1:21CR32 (DLF). Undersigned counsel's review of the dockets reveals that the issue was not fully briefed before this Court. In any event, counsel respectfully objects to the application of the enhancement based on the facts of Mr. Reid's case, the plain text of 2J1.2(b), the guidelines commentary, and judicial interpretation of the enhancement.

[5] Rather than summarizing Judge McFadden's reasoning, undersigned counsel has attached Judge McFadden's Order as Exhibit 4 and incorporates it by reference.

U.S.S.G. §2J1.2(b)(2) (emphasis added).

The guidelines application note states that "substantial interference with the administration of justice" includes:

> a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources.

U.S.S.G. §2J1 cmt. n. 1.

Courts do not interpret the guidelines in a manner different from their interpretation of statutory text. *E.g.*, *United States v. Martinez*, 870 F.3d 870 F.3d 1163, 1166 (9th Cir. 2017) ("We interpret the Sentencing Guidelines using the ordinary tools of statutory interpretation."). Thus, the proper inquiry into meaning "will most often begin and end with the text and structure of the Guidelines." *Id.* "The language of the Sentencing Guidelines, like the language of a statute, must be given its plain and ordinary meaning." *United States v. Fulford*, 662 F.3d 1174, 1177 (11th Cir. 2011). Therefore, courts' construction of the phrase "administration of justice" as it appears in Title 18 should not differ from their interpretation of the same phrase in the guidelines. *Id.*

Here, there is no real debate. Every circuit that has addressed the question has held that the phrase "administration of justice" refers to judicial proceedings. *United States v. Richardson*, 676 F.3d 491, 502-503 (5th Cir. 2012) ("[O]bstructing the due administration of justice means interfering with the procedure of a judicial hearing or trial."); *United States v. Brenson*, 104 F.3d 1267, 1279-80 (11th Cir. 1997) ("due administration of justice" means "judicial procedure" and "the performance of acts

required by law in the discharge of duties such as appearing as a witness and giving thoughtful testimony when subpoenaed"); *United States v. Warlick*, 742 F.2d 113, 116 (4th Cir. 1984) (defining obstruction of the "administration of justice" as acts that "thwart the judicial process"); *United States v. Rasheed*, 663 F.2d 843, 851 (9th Cir. 1981) ("administration of justice" commences with "a specific judicial proceeding").

The aforementioned application note to U.S.S.G. §2J1.2(b) bolsters that commonsense reading. Every example of substantial interference with the "administration of justice" involves interference with an investigation or evidence. U.S.S.G. §2J1 cmt. n. 1.

Text aside, law-of-the-case and estoppel principles foreclose application of these specific offense characteristics. As the Court knows, January 6 defendants have filed dozens of motions to dismiss the § 1512(c)(2) charge and in front of every judge of this Court. One of their arguments was that Congress's joint session to count electoral votes does not constitute an "official proceeding" under that statute because, among other reasons, it did not involve the administration of justice. In response, the government contended that the joint session did not need to entail the administration of justice to constitute an "official proceeding." And in dozens of filings the government all but conceded, that, in fact, the joint session did not administer justice. *See United States v. William Pepe*, 21-cr-52, ECF No. 55 (D.D.C. 2021), p. 8 n. 3 (government: "the certification of the Electoral College vote is not an 'inquiry or investigation'"); *United States v. Knowlton*, 21-cr-46, ECF No. 63 (D.D.C. 2021), p. 12 (government: "The 'proceeding before Congress' is not limited to proceedings solely related to the administration of justice."); *United States v. Nordean*, 21-cr-175, ECF No. 106 (D.D.C.

2021), p. 21 (government acknowledging that although § 1512(c)(2) had "never been applied" outside the context of the administration of justice, the "unprecedently brazen attack" on the Capitol justified application outside that context). The government's arguments on this score led the Court to positively hold that the joint session *does not administer justice. United States v. Montgomery*, 578 F. Supp. 3d 54 (D.D.C. 2021) ("Congress does not engage in . . . 'the administration of justice.'"); *see also United States v. Sandlin*, 575 F. Supp. 3d 16, 24 (D.D.C. 2021) ("[T]he Court will not read an 'administration of justice' requirement into 'official proceeding.'").[6]

Having denied defendants' dismissal motions that argued the joint session needed to, but did not, administer justice, the Court cannot find, under the same tools of interpretation, that "administration of justice" now means something different under the Guidelines. Under the law- of-the-case doctrine, "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." *United States v. Carr*, 557 F.3d 93, 101 (2d Cir. 2009). The doctrine is "driven by considerations of fairness to the parties, judicial economy, and the societal interest in finality." *Id.*

Indeed, it would be contrary to due process as well as nonsensical to assume that

---

[6] The government's arguments on this point appear to have evolved from a position that an official proceeding need not be "quasi-judicial" to arguing, as it has in this case, that the certification of the Electoral College vote does possess "tribunal-like" characteristics. ECF. No. 31 at 30. The government should not be permitted to walk back its earlier position that an "official proceeding" need not administer justice. It was the government's position and district judges relied on it to hold that January 6 defendants obstructed an "official proceeding." The substantial guidelines enhancement, however, should be reserved, as made clear in the plain text of the guideline, for those cases in which defendants obstructed judicial proceedings.

the Sentencing Commission meant to include "official proceeding" though it did not include the phrase in Section 2J1.1. As indicated, the Guidelines are interpreted using the same tools of construction that are employed in the interpretation of statutory text. *Martinez*, 870 F.3d at 1166; *Fulford*, 662 F.3d at 1177. The government and the defense alike cannot read words into the guidelines that the Commission did not include. Especially here, where reading words into the guideline results in an 11-level increase in the guideline range, which translates into *years* of a defendant's liberty.

Finally, it would be nonsensical to interpret "administration of justice" one way under the Guidelines and a different way in Title 18. It is not just that the interpretive tools are the same. *Martinez*, 870 F.3d at 1166; *Fulford*, 662 F.3d at 1177. It is that §2J1.2 was designed to sentence offenses under § 1503. U.S.S.G. §2J1.2 cmt Statutory Provisions. Section 1503 contains the exact same phrase, "administration of justice." Administratively, it would be chaotic for the phrases to hold different meaning.

### a.  §2J1.2(b)(1)(B) does not apply factually.

Mr. Reid has admitted that he damaged a water cooler and television while in the Capitol building. While he regrets his rash conduct, there is no evidence that he did so "in order to interfere with the administration of justice" as required by the Guidelines. It was an impetuous, reckless act, and he regrets it. But for such a substantial increase to his guideline range to apply for what amounts to a misdemeanor property offense, the guideline requires evidence that he damaged the water cooler and television with an intent to interfere with the administration of justice and no such evidence exists here.

### a. Nor does the "substantial interference" under 2J1.2(b)(2) specific offense characteristic apply.

The government appears to be seeking this offense characteristic in every § 1512(c)(2) case without regard to factual differences. The common thread linking the examples of "substantial interference" with the administration of justice in the relevant application note is acts that materially affect the *outcome* of the obstructed proceeding; for example, a prematurely terminated investigation or indictment procured through perjury. U.S.S.G. §2J1 cmt. n. 1. Here, Mr. Reid's actions had no causal relationship with the outcome or duration of the joint session. He assaulted no one and he did not encounter legislators or staff. He did not step foot in the Senate Chamber when Congress was meeting or at all. His conduct was similar to that of Class A and B misdemeanants who entered the building and engaged in disorderly conduct. There is no factual basis for calling Mr. Reid's conduct "substantially" obstructive unless the court is prepared to conclude that every protester who entered the building committed obstruction of justice (a leap even the government has not asked the Court to make thus far).

### ii.   Mr. Reid should receive credit for his unequivocal acceptance of responsibility.

Mr. Reid should receive a two-level decrease for his acceptance of responsibility. The PSR is incorrect in stating that Mr. Reid "put the government to its burden by denying essential factual elements of guilt." PSR ¶ 38. To the contrary, Mr. Reid signed a statement of offense admitting to all of the facts that supported his conviction on all counts of the Indictment and waived his right to a jury trial, saving the Court and the government time and resources. The only practical difference between the stipulated

trial agreement and the plea offer is that Mr. Reid—like many other January 6 defendants—wished to reserve his right to appeal the Court's denial of his Motion to Dismiss Count 1—a reasonable consideration in light of the government's novel application of the obstruction statute and the pending appeal in *United States v. Miller*. *United States v. Miller*, CRIMINAL ACTION 1:21-cr-00119 (CJN) (D.D.C. Mar. 7, 2022).

It bears noting that in the initial plea offer extended by the government, the government agreed that a three-level reduction under § 3E.1.1 would be appropriate. As part of the stipulated trial agreement Mr. Reid stipulated guilt to more offenses than his plea offer would have required.[7] It makes no sense that he would be denied adjustment for acceptance for stipulating guilt to *more* criminal conduct than the government's initial plea contemplated. Awarding Mr. Reid credit for his acceptance of responsibility would be consistent with the government's position in other January 6 cases that have resolved via stipulated trial. *See e.g., United States v. Judd,* 1:21-cr-00040 (TNM) (D.D.C. Dec. 28, 2021).

While the commentary to the Guidelines suggests that conduct resulting in an enhancement under 3C1.1 *ordinarily* indicates that the defendant has not accepted responsibility, this is not one of those ordinary cases. The commentary to the guideline provides an example of a defendant threatening a witness. Cmt. 7. The conduct here— shuttering a phone—was close in time to the offense conduct. Moreover, Mr. Reid narrated his crimes on social media while he was committing them (including

---

[7] *See* Exhibit 3, Government's Plea Letter

10

"destroying" his phone), making it easy for the law enforcement to investigate and prosecute him. So it is not as if his conduct *actually* impeded the government's investigation in any way. Nor did his conduct rise to the level of the example in the commentary—threatening a witness.

Moreover, since his arrest, Mr. Reid has consistently demonstrated his willingness to accept responsibility; first by not contesting his detention and then by entering into a stipulated trial agreement immediately upon arriving in the district. The government insinuates that the time lapse between Mr. Reid's indictment and the stipulated trial is indicative of a lack of acceptance of responsibility. The government knows full well that this is not the case. The delay was a result of Mr. Reid being detained outside the jurisdiction and even during that detention, Mr. Reid consistently indicated to counsel his desire to accept responsibly and seek a resolution of this case. In turn, counsel communicated as such with the government. Just as the government once agreed it should be, Mr. Reid's acceptance of responsibility should be accounted for in the offense level.

## II.     **Application of the sentencing factors.**

As this Court is aware, the central mandate of § 3553(a) requires district courts to impose a sentence "*sufficient, but not greater than necessary*" to comply with the purposes of sentencing set forth in § 3553(a)(2). This requirement is not just another factor for the Court to consider along with the others set forth in § 3553(a). Rather, it sets an independent limit upon the sentence. Application of the sentencing factors demonstrate that a sentence of 18 months is sufficient but no greater than necessary to meet the goals of sentencing.

i.      **An 18-month sentence is appropriate given Mr. Reid's history and characteristics.**

William Reid was born and raised in Florida. He is 37 years old. Raised in a middle-class suburb, he enjoyed a relatively stable childhood, though his parents divorced when he was seven years old. Intelligent and curious, Mr. Reid did well in school and attended some college.

Unfortunately, Mr. Reid has long-suffered from crippling anxiety and depression which for which he has never received professional treatment. Over time, he learned to cope with his anxiety by self-medicating with alcohol and by hiding behind a braggadocious, loud-mouthed online persona. His outspoken, vulgar online persona belied a roiling inner-turmoil about his place in the world and a deep sense of inadequacy. In his early twenties, Mr. Reid picked up a drinking habit that worsened over time and peaked during the pandemic after his business failed. Indeed, the PSR reflects that alcohol was behind most of Mr. Reid's criminal conduct and he has acknowledged the same in his letter to the Court.

During his twenties and early thirties, Mr. Reid worked in the hospitality industry, mostly in bars and restaurants. After having tended bar for a few years, in 2019, right before the pandemic, Mr. Reid decided that he wanted to open his own bar. He leased a space with a partner and began going about obtaining licenses and purchasing equipment. He was optimistic about his new venture. Of Mr. Reid's hope for the future, his good friend writes, "[h]e has always wanted to live the "American Dream" to have his own business, own a house, and raise and support his daughter in the best

12

family environment possible."[8] Soon after Mr. Reid put his money down for the lease on the bar, the COVID-19 pandemic hit, wiping out fledgling and established businesses across the globe, including Mr. Reid's bar. Though not his fault, Mr. Reid took the business's failure personally. His depression deepened and he turned to alcohol to numb himself much more than he ever had before. During this time, his online activity also accelerated and he would often stay up all night drinking and posting messages and memes online.[9]

Mr. Reid has acknowledged that he used reprehensible language on his social media posts. The things he said do not reflect who he is. Indeed, the attached letters describe a devoted father, a passionate, bright, and loving person. *See* Letter of Mike Jensen: ("Rogan is a great guy. He has strong values and beliefs. He loves his family and friends and is very passionate about life.").

Since his incarceration, Mr. Reid has been reckoning with the persona he projected online and the devil that fueled every instance of bad behavior: untreated alcoholism. Now that he has been sober for the first time in a long time, he has had reflected on how alcohol played a role in every wrong turn he took in his life. In his words: "Twenty months of being sober in jail has allowed me the opportunity to honestly

---

[8] Letter of Andres Chamorrro. Letters in support of Mr. Reid are attached hereto as Exhibit 2.
[9] During this time, he became involved on an online dispute with an Instagram "influencer," which is the subject of his pending charges in Florida. Those charges have not been adjudicated and counsel respectfully submits that the Court should decline to sentence Mr. Reid in this case based upon unrelated, pending charges.

evaluate my life."[10]  He is eager to seek treatment for his alcoholism both in prison and when he is released.

Indeed, Mr. Reid's daughter is, by all accounts, the most important person in the world to him. His daughter's mother and his ex-partner, Diane Macias, described Mr. Reid's love of his daughter in her letter to the Court. And while Ms. Macias acknowledged their relationship was marred by fights, she explains that they moved past their issues and now co-parent their daughter peacefully. She writes: "William has always been involved in our daughter's life and happily shared joint custody with me."[11]

This period Mr. Reid has been incarcerated is the longest time he has ever been away from his daughter. He appreciates that he is to blame for their separation and he has vowed to never do anything to cause him to be absent again.

### ii.    The nature and circumstances of the offense support a sentence of 18 months.

Mr. Reid did not have a long-standing grand plan to attend the President's widely-publicized "Stop the Steal" rally. He happened to be in North Carolina visiting family for the holidays when he and his brother made the spur of the moment decision to attend. They drove the six-hour drive together to attend the rally. His brother did not enter the Capitol building. Mr. Reid wore a jacket and black cap—no combat gear, goggles, or other paramilitary gear worn by some of the protestors. Throughout the day, he narrated his whereabouts and conduct on social media. At 2:15 p.m, he entered the

---

[10] Letter of William Reid
[11] Letter of Diane Macias, attached as part of Exhibit 2.

Capitol through the Senate Wing window, which had already been broken by other protestors.

**Mr. Reid entering the building**



Later, Mr. Reid entered the crypt where video shows him having a peaceful interaction of with a police officer.[12] At one point, the officer leans in to hear him better. The interaction appears to be peaceful.

**Mr. Reid in the Crypt**



Later, CCTV video captures Mr. Reid standing in the statutory hall connector speaking with a police officer but never in an aggressive or threatening manner. At one

---

[12] The Resistance.Samuel Montoya.INFOWARS.

point, he tries to calm the crowd as the crowd is swelling forward.[13] Immediately after the crowd moved forward in the statutory hall, Mr. Reid can be seen on the CCTV assisting an officer by leading him to a doorway and patting him on the shoulder.[14]

Mr. Reid did enter the Speaker's Lobby bathroom. At approximately 2:45 p.m., a protestor was shot by police. Mr. Reid heard the shot and the commotion that followed. Out of frustration, panic, anger, and fueled by alcohol, he damaged the television and water cooler.

After exiting the bathroom, Mr. Reid took an elevator down to what appeared to be like a tunnel to him and was led peacefully through a series of hallways to an exit without incident.[15]

 

Mr. Reid regrets entering the Capitol and damaging property in the bathroom. He regrets the blustering, bombastic, alcohol-fueled comments he posted on social media. But it is important for counsel to emphasize what he did not do: he did not utter

---

[13] 0259 USCH 02 Statuary Hall Connector - 2021-01-06_19h20min01s.mp4 at 13:15-15:49.

[14] 0251USCH02MainDoorHallnearH208_2021-01-06_14h35min49s187ms.mp4 CCTV at 2:36:06pm.

[15] 7115 CVC UL Tunnel to CHOB - 2021-01-06_19h40min01s.mp4 CCTV at 2:48:33pm; 7163 CVC UL Tunnel to CHOB - 2021-01-06_19h40min00s.mp4 CCTV at 2:48:55pm,

a single threatening word to a police officer and he did not assault any police officer or anyone else that day. He did not dress is combat gear or carry any weapons. And yet, the guideline range identified in the PSR and adopted by the government reflects the type of sentence one might expect for assaulting and injuring an officer or far worse. Simply put, a sentence of 18 months—a significant sentence for a non-violent offense— is sufficient but no greater that necessary to meet Mr. Reid's conduct on January 6 and after.

### iii. 18 months for Mr. Reid's non-violent conduct will avoid unwarranted disparities.

#### a. Sentences imposed in other Jan 6 Obstruction cases show that the defense request will avoid unwarranted disparity.

Of course, no two cases—even among those that arise from January 6—are identical. Counsel could parse through every case and find similarities and differences between Mr. Reid's conduct and others on Jan 6. Like many Jan 6 defendants, he was active on social media, where he often expressed his views, sometimes in a crass and divisive manner. Like hundreds of others, he entered the Capitol building. Like some, he has accepted full responsibility for his conduct. But unlike many, Mr. Reid did not injure or attempt to injure anyone or carry weapons. He was not among the first to breach a door or a window. And he is not and was not affiliated with an extremist organization. For these reasons, sentences imposed in the following cases show that the defense request would be consistent with sentences imposed in other cases in which defendants were convicted of destruction of property or obstruction but who did not engage in violence.

*United States v. Hunter Allen Ehmke*, 21CR29 (TSC): Defendant convicted by plea of felony destruction of property sentenced to four (4) months for systematically kicking in the lower panes of a window on the Capitol terrace. He also punched two additional window panes.

*United States v. Hodgkins*, 1:21CR188(RDM): Defendant convicted by plea of obstruction sentenced to 8 months incarceration, 24 months of supervised release for entering the Capitol wearing a backpack containing eye goggles, rope, and latex gloves. Defendant entered the Senate chamber and took "selfie" photos while shouting and cheering from a raised a platform.

*United States v. Michetti*, 1:21CR232 (CRC): Defendant convicted by plea of obstruction and sentenced to 18 months incarceration, 36 months of supervised release for entering the Capitol two minutes after the breach. Defendant is seen on video yelling "we pay you," at police officers. MPD officers used tear gas to push Michetti out of the hallway after which he returned and shouted, "you are starting a civil war," at the officers. Michetti left only after officers deployed tear gas on him again. Prior to attending the rally, Michetti texted "Gotta stop the vote it's fraud this is our country."

*United States v. Hunter Seefried*, 1:21CR287 (TNM): Defendant convicted of obstruction and other counts after a trial sentenced to 24 months, 12 months supervised release. Hunter Seefried ignored an officer's warning not to enter the building and entered the Capitol through a broken window. He was the fourth protestor to enter the building that day and was part of the group that chased Officer Goodman up the stairs to the clock tower hallway while protestors shouted, "where are they counting the

fucking votes." Seefried is seen on video pacing the hallway with clenched fist, refusing to leave when directed to do so.

*United States v. Jacob Chansley*, 1:21CR3 (RCL): Defendant convicted by plea to obstruction and sentenced to 41 months, 36 months supervised release. Chansley was dressed as the "Shaman" who became the face of January 6. Chansley climbed the scaffolding, entered the Capitol and roamed the second and third floors of the building. He also entered the Senate chamber, sat in Vice President Pence's chair and took pictures of himself. Chansely called other rioters up the dias and led them in an incantation which included "we will not allow the American way of the United States to go down." Finally, defendant Chansley gave a 60 Minutes interview claiming that he was lead into the Capitol by law enforcement and was trying to bring God back into the Senate.

*United States v. Secor*, 1:21CR157(TNM): Defendant convicted by plea of obstruction of justice sentenced to 41 months. Secor scaled scaffolding and entering through Senate Wing Door moments after rioters had broken into the door. Secor made his way through the Crypt, through the office suite of the Speaker of the House, and helped a group of rioters push open East Rotunda doors then guarded by officers, trapping three officers against the doors. Ultimately, Secor made it to the Senate Chamber where he sat in the seat occupied by Vice President Pence 30 minutes earlier. Like Reid, Secor posted numerous incendiary comments online such as "Election? Stolen. Patriots? Condemned. Protestors? Executed. Blood? Barely Dry." The phone that Secor used while on Capitol grounds was never recovered, suggesting that he

destroyed it. Using a new phone, Secor messaged a friend that he was deleting his Facebook account and deleted his Twitter account.

### b. The government's reliance on *U.S. v. Reffitt* is misplaced.

The government's reliance on this Court's sentence in *United States v. Reffitt* is misplaced. For one, defendant Reffitt had a lengthy jury trial, expending Court and government resources. Mr. Reid, by contrast, agreed to a statement of offense. He did not put the government to its burden and instead accepted full responsibility for his conduct. Moreover, the facts differ in significant respects. Reffitt possessed "multiple weapons" during the commission of his offenses and recruited a fellow militia group member to travel with him to the District to attend the rally. His companion also traveled with weapons, including an AR-15. Reffitt came dressed for battle: he donned a plate carrier vest and gave his companion zip ties to use for detaining people. Reffitt was a leader in the Texas Three Percenters, a group whose core belief that a small group of well-armed militia can overthrow the government. Based on these and other facts, the government sought an upward departure for "terrorism" under U.S.S.G. § 3A1.4.[16] None of these factors are present in Mr. Reid's case and his sentence should be substantially less than defendant Reffitt's.

Far from fairly assessing Mr. Reid's conduct, the government's request exceeds the sentences imposed on defendants who have physically assaulted and injured police officers. *See e.g., United States v. Ponder*, 1:21CR259(TSC) (defendant sentenced to 63 months for swinging at officers with the baseball bat, striking one officer in the shoulder

---

[16] *United States v. Reffitt*, 1:21CR32, ECF No. 158.

and returning to fighting at the Capitol even after having been escorted away. Defendant Ponder had a long criminal history including violent crimes);*United States v. Scott Fairlamb*, 1:21CR120(RCL) (defendant sentenced to 41 months for obtaining a police baton and brandishing the baton at police while entering the Capitol, shoving an officer, and punching his face shield after isolating the officer. During all of the assault defendant was yelling "What Patriots do? We fuckin' disarm them and then we storm the fuckin' Capitol.").

### c. The Court should consider the dispositions in the "Portland Riot" cases.

In sentencing Mr. Reid, counsel respectfully submits that the Court should also consider the government's charging decisions and sentences imposed on rioters who attempted to breach a federal building in protest during the summer of 2020. Indeed, following the murder of George Floyd, protestors descended on the Federal Courthouse in Portland, Oregon. According to the government, the protests in Portland were followed by "nightly criminal activity in the form of vandalism, destruction of property, looting, arson, and assault. . . the Courthouse has experienced significant damage to the façade, glass, and building fixtures during the weeks following this incident."[17] The majority of those protestors received diversionary agreements or their cases were outright dismissed by the government. Prison sentences were imposed only in cases where protestors physically assaulted and injured officers.[18] In response to defense

---

[17] *United States v. Bouchard*, case no. 3:20-mj-00165 (D. Ore. July 24, 2020), ECF 1-1 at 4-5.

[18] *See* Chart assembling dispositions in Portland Riot cases, attached hereto as Exhibit 5.

motions alleging selective prosecution, the government has argued that the Portland riot cases are categorically different then the January 6 cases. But that the defendants have not been found to meet the high standard to prevail on a claim of selective prosecution, should not preclude the Court from considering the sentences imposed in those cases, which also involved the destruction of property, vandalism, and assault on police officers carried out during a political protest in a federal building.[19] The disposition of those cases show that a sentence of 18 months for Mr. Reid's conduct would come closer to avoiding unwarranted disparity with other cases involving damage to a federal building and vandalism that occurred during political protest.

### iv.    The other sentencing factors are met by a sentence of 18 months.

Eighteen months in prison will serve as a just punishment and adequate deterrent. This is the first time that Mr. Reid has ever spent time in prison. It has had a sobering effect on him. He has expressed his regret in his letter to the Court and to friends and family. He needs no further specific deterrence.

As for general deterrence, sentencing Mr. Reid to six and a half years in prison for entering the Capitol with the intent to delay the certification of the vote and what amounts to misdemeanor property offenses is not the salve that the country needs to ensure that January 6 was an isolated horror. An event like January 6 is unlikely to

---

[19] *See* Order denying Motion for Discovery on Selective Prosecution because defendant had "failed to make a credible showing of different treatment of similarly situated persons" but finding that "disparate charging decisions in similar circumstances may be relevant at sentencing." (internal citations omitted). *United States v. David Judd*, 1:21CR40(TNM) ECF. No. 203 at 12.

happen to again[20] and even if it did, the public will not deterred by the prison sentence imposed on an obscure man from Davie, Florida. Further, even if future, hypothetical political protestors were capable of such deductive reasoning, empirical evidence proves that the certainty of prosecution, rather than the severity of punishment is the greater deterrent.[21] To this end, the Justice Department moved swiftly to prosecute "low hanging fruit" like Mr. Reid—men and women who, at the invitation of the President of the United States and other powerful people, attended a rally, the very title of which suggested that its goal was to stop the certification of the election. Yet, while requesting prison sentences that will surely devastate the lives and families of average Americans, many of whom attended the rally because they were fed lies by prominent politicians and the President that the election had been "stolen," the Justice Department has neglected to charge the most culpable, namely those that organized and incited the event.[22] This is significant because the types of individuals willing to participate in an event like January 6 are only going to be deterred if the individuals responsible for the event, namely, the organizers and executors, face criminal charges and incarceration.

---

[20] See transcript of video sentencing in *United States v. Douglas Sweet*, 21CR41-3 (The Honorable Judge Nichols states, "It is unlikely that the circumstances of led to their actions on January 6 will occur again. It is unlikely that the sitting President will invite them, as part of a large crow, to protest and demonstrate, even fight at the Capitol. . . ").

[21] *See* National Institute of Justice, *Five Things About Deterrence* (June 5, 2016), full article available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence

[22] *See* Sentencing Transcript in *United States v. Cavanaugh*, 21CR362 (The Honorable Judge Mehta states, "It really does, in my mind, go to the power of propaganda; the power of being told lies over and over again; told by leaders who knew better, that something was taken away from the people when it wasn't. . . people were told over and over again that was not true, so much so that the people like [the defendant] lost his way.").

Likewise, imposing harsh prison sentences on men like Mr. Reid—men came to rally disillusioned and in financial and emotional crisis—while letting the powerful organizers off scot free will undermine respect for the law rather than promote it.

Finally, with respect to rehabilitation, Mr. Reid is well on his way, having confronted his substance abuse disorder for the first time in his life. As he explains in his letter, he now realizes that he needed to get sober and he is committed to transforming this experience into long-lasting change. To that end, Mr. Reid writes, "I've never been more honest with myself and with what I want out of my life. I have my experience here to thank for that. I am more determined than ever before to change my life around."[23] A sentence of 18 months is sufficient but no greater than necessary to achieve the goals of sentencing, including the need to achieve correctional treatment in the most effective manner.

## CONCLUSION

For the foregoing reasons, and such others as may be presented at the sentencing hearing, Mr. Reid respectfully requests that the Court impose no more than 18 months of incarceration, and no more than $100 in special assessments, and that the Court recommend that the Bureau of Prisons house Mr. Reid in a facility that offers the Residential Drug Abuse Program. Finally, Mr. Reid agrees with the PSR's assessment that he is not in a position to pay a fine.

Respectfully submitted,


A. J. Kramer

---

[23] Letter of William Reid, attached hereto as Exhibit 1

Federal Public Defender

_____/s/_____
Elizabeth Mullin
Assistant Federal Public Defender
625 Indiana Ave NW, Suite 550
Washington, D.C. 20004
(202) 208-7500