**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-316-DLF** |
| **WILLIAM ROGAN REID,** | |
| **Defendant.** | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this response to the defendant's Memorandum in Aid of Sentencing (ECF. No. 36). Defendant objects to the PSI's imposition of the eight-level enhancement under § 2J1.2(b)(1)(B) and to the three-level enhancement under § 2J1.2(b)(2) (ECF No. 36, at 4-9). Defendant asks the court to reject its reasoning in *United States v. Reffitt*, No. 21-cr-032, and instead adopt the reasoning of Judge McFadden in *United States v. Seefried*, No. 21-cr-287. Defendant's objections should be overruled.

Defendant also argues that in determining its sentence, the Court should consider charges and sentences stemming from protests in Portland, Oregon in the summer of 2020 (ECF No. 36, at 21). As discussed below, that information will not assist the Court in avoiding unwarranted sentencing disparities.

Finally, Defendant claims that his decision to travel to Washington, D.C. on January 6 was a "spur of the moment decision" (ECF No. 36, at 14). To the contrary, Defendant's social media posts (Exhibit A) show that by late in the evening on January 1, 2021, he had already decided to go Washington, D.C., tried to recruit others to join him there, that he booked a flight for January

1

5, 2021, and only after his flight was cancelled, drove to Washington, D.C.

## A.    THE SECTION 2J1.2(b) ENHANCEMENTS APPLY TO DEFENDANT

### 1.    The certification of the Electoral College vote involved the administration of justice as defined broadly in the Guidelines.

Section 2J1.2, entitled "Obstruction of Justice," applies to a variety of obstruction offenses, including all offenses under § 1512 and under 11 other statutes found in Chapter 73 of Title 18. *See* U.S.S.G. § 2J1.2 cmt.; U.S.S.G. Appendix A. It provides for an eight-level increase if the offense involved causing or threatening injury to a person or damage to property "in order to obstruct the administration of justice." U.S.S.G. § 2J1.2(b)(1)(B). It also provides for a three-level increase "if the offense resulted in substantial interference with the administration of justice." U.S.S.G. § 2J1.2(b)(2).

Section 2J1.2's text, purpose, and commentary all demonstrate that conduct that obstructs Congress's certification of the Electoral College vote interferes with the "administration of justice" for purposes of the guideline. Administration of justice, in its broadest sense, refers to the proper administration of law by all three branches of government. Black's Law Dictionary defines "justice" to include "[t]he fair and proper administration of laws," and it defines "obstruction of justice" as "[i]nterference with the orderly administration of law and justice." Black's Law Dictionary (11th ed. 2019); *see* Ballentine's Law Dictionary 696 (3d ed. 1969) (defining justice to include "exact conformity to some obligatory law"). When defining "contempt" to include "[c]onduct that defies the authority or dignity of a court *or legislature*," Black's Law Dictionary observes that "such conduct interferes with the administration of justice." Black's Law Dictionary (11th ed. 2019) (emphasis added). And courts have defined "administration of justice" to mean "the performance of acts or duties required by law," *Rosner v. United States*, 10 F.2d 675, 676 (2d

Cir. 1926) (quotation omitted), or "the performance of acts required by law in the discharge of duties," *United States v. Partin*, 552 F.2d 621, 641 (5th Cir. 1977).

To be sure, the term "administration of justice" is more commonly used in a narrower sense to refer to "interference with the pendency of some sort of judicial proceedings." *In re Kendall*, 712 F.3d 814, 828 (3d Cir. 2013); *see In re McConnell*, 370 U.S. 230, 234, 236 (1962) (defining the term in the contempt context as relating to "the performance of judicial duty"); *United States v. Aguilar*, 515 U.S. 593 (1995) (stating that the "omnibus clause" of 18 U.S.C. § 1503, which criminalizes obstruction of the "due administration of justice," requires proof of "an intent to influence judicial or grand jury proceedings"). But there are compelling reasons for concluding that "administration of justice" bears its broader (albeit less common) meaning in U.S.S.G. § 2J1.2.

First, § 2J1.2's context and purpose support the broader reading of "administration of justice" in both (b)(2) and (b)(1)(B). Section 2J1.2 applies to an array of obstruction statutes, including a number that do *not* involve the "administration of justice" in the narrow sense (i.e., relating to judicial or quasi-judicial proceedings). *See* U.S.S.G. § 2J1.2 cmt. (listing covered statutes); U.S.S.G. Appendix A (statutory index). Those offenses include concealing or destroying invoices or papers relating to imported merchandise, 18 U.S.C. §§ 551; obstructing an investigation under the Workforce Innovation and Opportunity Act, 18 U.S.C. § 665(c); obstruction of proceedings before departments, agencies, and committees, 18 U.S.C. § 1505; obstruction of enforcement of state gambling laws, 18 U.S.C. § 1511; obstruction of official proceedings, 18 U.S.C. 1512; obstruction of a federal audit, 18 U.S.C. § 1516; destruction of documents in agency investigations, 18 U.S.C. § 1519; and interfering with the administration of the Internal Revenue Code, 26 U.S.C. § 7212. Yet under a narrow interpretation of the guideline,

the enhancements under §§ 2J1.2(b)(1)(B) and (b)(2) would not apply to those statutes. That is good reason to reject such a reading. *Cf. United States v. Castleman*, 572 U.S. 572 U.S. 157, 167 (2014) (rejecting a reading of 18 U.S.C. § 922(g)(9) that "would have rendered [it] inoperative in many States at the time of its enactment").

Section 2J1.2's background indicates that the Sentencing Commission intended the enhancements to reach the type of violent and dangerous conduct at issue in this case. The background notes that § 2J1.2 broadly covers crimes "of varying seriousness," including offenses that involve intercepting grand jury deliberations, interfering with an illegal gambling investigation, or obstructing "a civil or administrative proceeding," and that the underlying conduct may "range from a mere threat to an act of extreme violence." U.S.S.G. § 2J1.2 cmt. Background. Within that range, the enhancements "reflect the more serious forms of obstruction." *Id.* The Commission thus crafted the enhancements in § 2J1.2 to cover the most egregious *conduct* in the full knowledge that obstruction-of-justice offenses are not limited solely to interference with judicial proceedings.

Relatedly, limiting subsection (b)(1)(B)'s and (b)(2)'s enhancements to obstruction of judicial proceedings would undermine the purpose of the Guidelines. "A principal purpose of the Sentencing Guidelines is to promote uniformity in sentencing imposed by different federal courts for similar criminal conduct." *Hughes v. United States*, 138 S. Ct. 1765, 1774 (2018). The Guidelines therefore seek to achieve "a strong connection between the sentence imposed and the offender's real conduct." *United States v. Booker*, 543 U.S. 220, 246 (2005). The Sentencing Commission quite reasonably determined, for example, that "causing or threatening physical injury to a person, or property damage, in order to obstruct the administration of justice" is more

serious than obstruction not involving such injury or threats and should be punished more severely. U.S.S.G. § 2J1.2(b)(1)(B). And the seriousness of the threatening or injurious conduct does not depend on whether the obstructed proceeding is judicial, legislative, or executive. There is no sound basis for assigning a significantly higher offense level to someone who violently interferes with a court proceeding than someone who violently interferes with a congressional proceeding. *See United States v. Rubenacker,* 21-cr-193 (BAH), May 26, 2022 Sentencing Hearing Tr. at 69 ("There is simply no indication in guideline Section 2J1.2 that the [specific offense characteristics] containing the phrase 'administration of justice' were meant to apply to only some of the statutes referenced to this guideline and not to apply to all of the cases involving obstruction of proceedings taking place outside of courts or grand juries; that simply doesn't make sense.")

This is especially true considering that subsections (b)(1)(B) and (b)(2) are not simply two factors among many but are the key sentencing factors in most obstruction cases. The three other enhancements in § 2J1.2 have limited application. Subsections (b)(1)(A) and (b)(1)(c) apply only to violations of § 1001 and § 1505 relating to sex or terrorism offenses. And subsection (b)(3), a comparatively minor two-level increase, applies only where a document was destroyed or altered or the offense was "extensive in scope, planning, or preparation." U.S.S.G. § 2J1.2(b)(3). Reading the enhancements in subsection (b)(1)(B) and (b)(2) as applying only to judicial or quasi-judicial proceedings would fail to distinguish between the seriousness of offenders' conduct in a wide variety of obstruction offenses covered by § 2J1.2. On the other hand, reading the term "administration of justice" more broadly eliminates this gap in the guideline.

Second, Section 2J1.2's commentary provides a broad definition of "administration of justice." It defines "[s]ubstantial interference with the administration of justice" to include "a

premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; or *the unnecessary expenditure of substantial governmental or court resources*." U.S.S.G. § 2J1.2 cmt. n.1 (emphasis added). This definition includes interference not only with "court" resources, but also with any "governmental" resources, a term that includes congressional resources. The Supreme Court has held that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993). Because this commentary is consistent with the plain text of the Guideline, which uses the broad term "administration of justice," it is authoritative.

To be sure, the commentary defines only the term "substantial interference with the administration of justice," which serves as the basis for the three-point enhancement in U.S.S.G. § 2J1.2(b)(2) and does not specifically define the term "in order to obstruct the administration of justice," which serves as the basis for the eight-point enhancement in U.S.S.G. § 2J1.2(b)(1)(B). But the relevant term "administration of justice" is identical and should be given the same interpretation in both enhancements. The operative verbs "interfere[]" and "obstruct" carry the same meaning in this context. And the adjective "substantial" in § 2J1.2(b) does not change the meaning of "administration of justice," especially since the commentary repeats the word, requiring "the unnecessary expenditure of *substantial* governmental . . . resources."   U.S.S.G. § 2J1.2 cmt. n.1 (emphasis added). Thus, the term "in order to obstruct the administration of justice" in U.S.S.G. § 2J1.2(b)(1)(B) should be read to include obstructive conduct aimed at nonjudicial governmental activities. A different conclusion would lead to the incongruous result of giving two

different meanings to the term "administration of justice" within the same guideline. *See Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning.").

Obstruction of the Electoral College certification vote on January 6, 2021 falls comfortably within the meaning of "administration of justice" as used in § 2J1.2 because it involved Congress's performance of duties required by law. Specifically, Congress's certification of the Electoral College vote was an official proceeding required by both the Constitution and federal statutes.[1] *See* U.S. Const. art. II, § 1, cl. 3; 3 U.S.C. §§ 15-18. Application of both subsections (b)(1)(B) and (b)(2) is therefore appropriate here.

### 2.     Courts in other January 6 cases, including this Court, have correctly held that non-judicial proceedings can involve the administration of justice.

Other courts have appropriately applied the "administration of justice" enhancements in U.S.S.G. § 2J1.2(b)(2) to efforts to obstruct a wide range of proceedings that were not limited to judicial or grand jury proceedings. *See United States v. Ali*, 864 F.3d 573, 574 (7th Cir. 2017) (upholding the application of § 2J1.2(b)(2) after law enforcement officials expended substantial resources to recover the defendant's children he kidnapped and transported internationally); *United*

---

[1] Chief Judge Howell has articulated a different basis on which to apply the enhancement to obstruction of the Electoral College certification. *United States v. Rubenacker*, 21-cr-193 (BAH), Sentencing Hearing Tr. at 69. She pointed out that Black's Law Dictionary defines "administration of justice" to include the "maintenance of right within a political community by means of the physical force of the state," Black's Law Dictionary (11th ed. 2019), and observed that the joint session of Congress used "'the physical force of the state' in the form of law enforcement officers located in and around the Capitol to secure the proceedings." *Rubenacker*, Sentencing Tr. at 75. This understanding of the guideline is arguably broader than the interpretation advanced by the government because it could apply to any proceeding (or event) at which there was a police presence, rather than being limited to proceedings involving the administration of the law.

*States v. Atlantic States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180, 205-08 (D.N.J. 2009) (applying § 2J1.2(b)(2) after a defendant interfered with OSHA investigations into a workplace accident); *United States v. Weissman*, 22 F. Supp. 2d 187, 194-98 (S.D.N.Y. 1998) (applying § 2J1.2(b)(2) after a defendant withheld subpoenaed documents from a congressional subcommittee).

In the specific context of January 6, this Court applied § 2J1.2's "administration of justice" enhancements in *United States v. Guy Reffitt*, No. 21-cr-32, observing that "the guidelines clearly direct [§ 1512(c) prosecutions] to 2J1.2, which is entitled "Obstruction of Justice. And it's hard for me to conclude simply because the Sentencing Commission didn't anticipate and incorporate every definition in the statute in the shorthand, if you will, for these enhancements, that that means that the Commission intended to exclude this offense" (Sentencing Tr., at 35). The Court also noted that it would lead to unwarranted sentencing disparities to only apply these enhancements in "cases involving what we classically think of as administration of justice" (*Id*. at 36).

Consistent with this holding, several other courts have applied § 2J1.2's "administration of justice" enhancements in cases arising from the Capitol breach on January 6, both in cases where the parties agreed to their application and where the application was contested. *See, e.g.*, *United States v. Wilson*, No. 21-cr-345 (Lamberth, J.); *United States v. Hodgkins*, No. 21-cr-188 (Moss, J.); *United States v. Fairlamb*, No. 21-cr-120 (Lamberth, J.); *United States v. Chansley*, No. 21-cr-003, (Lamberth, J.); *United States v. Matthew Miller*, No. 21-cr-075 (Moss, J.) (uncontested, but independently addressed by the Court); *United States v. Rubenacker*, No. 21-cr-193 (BAH) (contested); *United States v. Pruitt,* No. 21-cr-23 (Kelly, J.); *United States v. Robertson,* 21-cr-34 (Cooper, J.) (contested).

8

**3.      Judge McFadden's contrary conclusion in *Seefried* and *Secor* is unpersuasive.**

One judge on this Court, Judge McFadden, has reached a contrary conclusion, concluding that "administration of justice" in § 2J1.2 is limited to "a judicial or related proceeding that determines rights or obligations." *United States v. Seefried*, No. 21-cr-287, Doc. 123, at 1 (D.D.C. Oct. 29, 2022) (TNM); *see United States v. Rodean*, No. 21-cr-57, Doc. 76 (D.D.C. Oct. 26, 2022) (restricted statement of reasons); *United States v. Secor,* No. 21-cr-157, Doc. 56 at 17-20 (Oct. 24, 2022) (TNM); *United States v. Hale-Cusanelli*, No. 21-cr-37, Doc. 120 at 50-55 (D.D.C. Sep. 27, 2022). Judge McFadden's reasons for reaching that conclusion, however, are not persuasive.

Judge McFadden first discussed Black's Law Dictionary's definitions of "administration of justice" and "due administration of justice," which, he concluded, "suggest that the 'administration of justice' involves a judicial or quasi-judicial tribunal that applies the force of the state to determine legal rights." *Seefried*, Doc. 123 at 4. He also considered that dictionary's definition of "obstructing" and "interfering with" the administration of justice, a definition that he determined "further corroborates that the 'administration of justice' involves something like a legal proceeding, such as a trial or grand jury hearing." *Id.* at 5. But Judge McFadden did not consider the broader definitions of "justice" and "obstruction of justice" cited above, which relate to the orderly administration of the law more generally. Indeed, Black's Law Dictionary recognizes that "[c]onduct that defies the authority or dignity of a court *or legislature* . . . . interferes with the administration of justice." Black's Law Dictionary (11th ed. 2019) (emphasis added).

Nor does Judge McFadden's corpus linguistics analysis support a different result. Surveying a representative sampling of 375 uses of the term "administration of justice" in legal usage between 1977 and 1987, Judge McFadden found that about 65% of the hits referred to "a

judicial proceeding deciding legal rights," about 4% involved "law enforcement activities," and only three entries "referr[ed] to government function generally." *Seefried*, Doc. 123 at 11-13. But the simple fact that the term *usually* bears judicial connotations does not mean that it *must*, particularly where, as here, the guideline's context, purpose, and commentary point in a different direction. Like all words, legal terms often bear multiple meanings. For example, the term "suppression of evidence" can refer either to a court's exclusion of evidence from trial or to the prosecution's withholding of favorable evidence from the defense. Which meaning the term bears in a particular instance cannot be determined by the frequency of each meaning within the legal corpus. And in this case, the frequent use of other meanings is no reason to reject a broader meaning of "administration of justice" that gives full effect to the guideline and corresponds with the commentary's definition.

Judge McFadden was also incorrect in his analysis of § 2J1.2's commentary. *Seefried*, Doc. 123 at 14-17. As an initial matter, he questioned whether the commentary was even "authoritative," pointing out that the D.C. Circuit "has suggested that courts should eschew deference to the Commission when the commentary expands the meaning of the text of the Guidelines themselves." *Id.* at 14 (citing *United States v. Winstead*, 890 F.3d 1082, 1092 (D.C. Cir. 2018)). But *Winstead* involved a very different situation, in which the guideline's text included a specific list of crimes defined as "controlled substance offenses" and the commentary added an additional *attempt* crime that was "not included in the guideline." *Winstead*, 890 F.3d at 403. The D.C. Circuit held that "[b]y purporting to add attempted offenses to the clear textual definition," rather than "interpret[ing] or explain[ing] the ones already there," the commentary conflicted with the guideline and was not authoritative under *Stinson*. *Id.* at 404. Here, by contrast, the commentary

10

does not attempt to add to a finite list of offenses, but rather "explain[s]" that the term "administration of justice" bears a broad meaning that includes non-judicial proceedings.

Nor was Judge McFadden correct that—even if it is binding—§ 2J1.2's commentary supports only "a narrower interpretation of the 'administration of justice.'" *Seefried*, Doc. 123 at 15. Although the other definitions in the commentary undoubtedly relate to "investigations, verdicts, and judicial determinations," that fact does not support a definition that excludes congressional proceedings. The commentary's use of the word "includes" indicates that the definition is not an exhaustive list. *See* Antonin Scalia & Bryan A Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012). And the inclusion of the "premature or improper termination of a felony investigation" indicates that the definition applies to executive-branch investigations that are not yet before a grand jury or court.

Reading the commentary's use of the word "governmental . . . resources" to include congressional resources would not, as Judge McFadden concluded, "render[ ] the phrase 'or court' superfluous." *Seefried*, Doc. 123 at 17. Although a "broad definition" of "governmental" could "include court resources," *id.*, using both terms in an attempt to sweep in all three branches of government is hardly an obvious superfluity. The Sentencing Commission could have added the word "court" to clarify that the term "governmental" did not exclude courts. And the purported superfluity could be avoided by reading "governmental . . . resources" to refer to the resources of both the executive and legislative branches (as opposed to the judicial). The superfluity canon provides no basis to limit the term to "*prosecutorial* resources." *Id.* Moreover, Judge McFadden's interpretation of the commentary runs into its own superfluity problem. If, as he concluded, the

term "administration of justice" in § 2J1.2 refers only to "a judicial or related proceeding," *id.* at 1, then the word "governmental" is itself superfluous. This reading should be rejected.

Judge McFadden's concern that a broader reading of "administration of justice" would allow the government to "trigger the enhancements at will" is also misplaced. *Seefried*, Doc. 123 at 16. The enhancements in § 2J1.2 do not apply whenever the offense "caused unnecessary expenditures of its resources" in some attenuated way, such as by causing the government to later bring a prosecution. *Id.* ("While the events of January 6 caused the Government to commit significant resources—evidenced in part by the number of cases charged in this district—this argument proves too much."). Instead, the enhancement is best read as applying where the obstructive conduct itself—not the later prosecution of that conduct—caused the unnecessary expenditure of substantial governmental or court resources. *See United States v. Harrington*, 82 F.3d 83, 87 n.2 (5th Cir. 1996) (observing that the case resulted in the expenditure of "substantial resources . . . over and above the routine costs of prosecuting the obstruction offense"). If the enhancement could truly be triggered simply by "charg[ing]" a case, *Seefried*, Doc. 123 at 16, then even under Judge McFadden's reading the enhancement would apply every time the government brought a felony prosecution, which results in the expenditure of substantial "court" and "prosecutorial" resources, *id.* at 16-17. Judge McFadden's conclusion that "governmental" should be read to exclude Congress simply does not follow from his concerns about excessive application of the enhancements.

Judge McFadden was also incorrect in perceiving a conflict between the government's interpretation of "administration of justice" in § 2J1.2 and the same term in 18 U.S.C. § 1503, which contains a catchall provision prohibiting obstruction of "the due administration of justice."

*See Seefried*, Doc. 123 at 5-6 (observing that the government had not charged any January 6 defendants under § 1503), 20-21 (saying it would be "incongruous" to conclude that "official proceeding" means something different in the Sentencing Guidelines than in the statutory context). The Supreme Court has made clear that a term can have a different meaning in the Sentencing Guidelines than it does in a statute. *DePierre v. United States*, 564 U.S. 70, 87 (2011). And there are at least three differences between § 1503 and § 2J1.2 that counsel in favor of reading them differently. First, unlike § 1503, § 2J1.2 includes its own definition of the "administration of justice," which covers the expenditure of "governmental *or* court" resources. Second, § 1503 appears in the context of a statute that applies to jurors, court officers, and judges, which may favor a narrower reading of the catchall provision for interference with the "due administration of justice." And, third, § 2J1.2's entire purpose is to distinguish between levels of culpability for those who violate a wide variety of obstruction statutes, many of which are not limited to judicial or quasi-judicial proceedings.

Judge McFadden's reading of § 2J1.2 also creates difficult line-drawing problems. Under his reasoning, the enhancements in subsection (b)(1)(B) and (b)(2) apply only to offenses where the obstructed proceedings were "judicial" or "quasi-judicial" in nature. *Seefried*, Doc. 123 at 4. But those terms themselves raise difficult questions about how closely the obstructive conduct must "relate[]" to a judicial proceeding or what proceedings can be said to "determine[] rights or obligations." *Id.* at 1. For example, 18 U.S.C. § 1505 applies to obstruction of an investigation by the House Ethics Committee, which has the power to discipline current members of Congress. That inquiry would seem to be "quasi-judicial" and one that "determines rights or obligations," *id.* at 1, 4, yet it does not involve the "possibility of punishment by the state," *id.* at 4. The

government's broader reading of "administration of justice," by contrast, would apply to all the obstruction offenses covered by § 2J1.2. Under the government's reading, therefore, a sentencing court need not answer difficult questions about whether a proceeding is sufficiently "judicial" or "quasi-judicial" to trigger subsections (b)(1)(B) and (b)(2).

Moreover, even under a narrower reading of administration of justice, the certification fits within the definition because it has quasi-judicial features. The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election. 3 U.S.C. § 15. As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection. *Id.* Congress's certification of the Electoral College vote, moreover, must terminate with a decision: Congress may not recess until "the count of electoral votes" is "completed," and the "result declared." 3 U.S.C. § 16. Indeed, for these reasons, several judges on this Court have concluded that Congress's certification of the Electoral College is a "quasi-adjudicative or quasi-judicial" proceeding. *United States v. Nordean*, 579 F. Supp. 3d 28, 43 (D.D.C. 2021); *see United States v. Robertson*, 588 F. Supp. 3d 114, 121-22 (D.D.C. 2022) (holding that "the certification of the Electoral College vote is quasi-adjudicatory"); *United States v. Caldwell*, 581 F. Supp. 3d 1, 14-15 (D.D.C. 2021) (holding that the certification was "an 'adjudicatory' proceeding").

### 4.   § 2J1.2(b)(1)(B) applies to the facts of the offense.

Defendant argues that the eight-level enhancement under § 2J1.1(b)(1)(B) does not apply because he did not damage property "in order to interfere with the administration of justice." But the enhancement clearly applies. Property damage to the Capitol was an integral part of the January

6 attack. The theft and destruction caused by the rioters included wrecked platforms, broken glass and doors, graffiti, broken furniture, and damaged artwork. *See* ECF No. 31, at 6. None of these acts directly stopped the certification. But each contributed to the overall attack on the Capitol. Each act of property damage motivated other rioters, demonstrating to them in real time that the rioters were in control of the Capitol. The property damage also sent a message of intimidation – reminding the Congressional staff of the "power" the mob wielded. And, in some cases, the damage was purely malicious – an attempt to retaliate against Congress for what the rioters perceived was an attempt by Congress to "steal" the election.

Defendant has admitted that while inside the Capitol, he willfully and knowingly "engaged in disorderly or disruptive conduct with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress" (ECF No. 31, at 12). The facts show that the property damage he committed was part of this "disorderly or disruptive conduct." There was no temporal or geographic attenuation between Reid's actions and the certification proceedings — Reid's property damage occurred in the middle of the riot, extremely close to the House Chamber. Reid knew he was in the "House Women's bathroom," and his property damage occurred in front of other rioters, after "the crowd started pouring in" (ECF No. 35, at 20). His attack was instigated by and in reaction to seeing a democratic Congresswoman on television (*id.*), showing that his violence was connected to his animosity towards Congress.

Defendant cites no authority that there must be a causal link between his property damage and the outcome or duration of the certification proceedings. Nor have any other courts in the January 6 cases limited the enhancement to rioters who encountered "legislators or staff" (ECF No. 36, at 9). To the contrary, courts addressing the scope of the enhancement have determined,

for example, that it applies even where a threat was not communicated to the intended target. *See United States v. Grap*, 368 F.3d 824, 832 (8th Cir. 2004). A motivation of vengeance or retaliation after the fact is also sufficient. *See United States v. Duarte*, 28 F.3d 47 (7th Cir. 1994). In *Duarte*, a defendant threatened a witness after pleading guilty to the drug offense in which the witness would have testified. The defendant argued that because the witness would not be testifying, his threat could not have obstructed the administration of justice. *Id*. at 48. The Seventh Circuit disagreed, noting that the purpose of U.S.S.G. 2J1.2(b)(1) is to distinguish threats of physical injury or property damage from "lesser threats," rather than to "introduce refined distinctions within the broad category of obstruction of justice." *Id.*

The law is also clear that for a conviction, a defendant's unlawful purpose to obstruct justice need not be the defendant's "sole or primary" purpose. *See United States v. Smith*, 831 F.3d 1207, 1217-18 (9th Cir. 2016). As Chief Judge Howell recently instructed the jury in *United States v. Herrera*, No. 21-CR-619, "While the defendant must act with intent to obstruct the official proceeding, this need not be his sole purpose. A defendant's unlawful intent to obstruct justice is not negated by the simultaneous presence of another purpose for his conduct." *Herrera*, ECF No. 65, at 7.

Thus, whether Reid's motive in damaging property was to influence the certification proceedings, to motivate the rioters around him, to intimidate the future occupants of the bathroom, to seek "vengeance" against those who were certifying the election, or some combination of these motives, the enhancement applies.

**5.      § 2J1.2(b)(2) applies to the facts of the offense.**

Similarly, the three-level enhancement of § 2J1.2(b)(2) applies to the defendant's conduct. Defendant willfully and knowingly joined a mob to obstruct congressional proceedings. While defendant alone could not have created the same degree of chase and disruption, a mob cannot exist without its individual members. Moreover, defendant was an active participant in the breach, not only encouraging the crowd, but physically directing rioters and encouraging them to enter the Capitol.

Defendant's presence as part of the mob had a direct causal relationship with the delay of the certification. Defendant and the other rioters entered the Capitol with no security screening or weapons check. Congressional proceedings could not resume until every unauthorized occupant had left the Capitol and the building had been confirmed secured.

The commentary also defines "[s]ubstantial interference with the administration of justice" to include "the unnecessary expenditure of substantial governmental or court resources." U.S.S.G. § 2J1.2, cmt. n.1. Defendant's presence as part of the mob — and the property damage he personally caused — required the unnecessary expenditure of substantial resources, not only in terms of the police required to defend the Capitol and clear it of rioters, but also to repair the damage.

**B.      DEFENDANT'S LIST OF CASES IS NOT RELEVANT TO THE GOAL OF AVOIDING UNWARRANTED SENTENCING DISPARITIES**

Defendant's proffer of information about cases from Portland, Oregon in the summer of 2020 is not relevant to the goal of avoiding unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6).

First, and fundamentally, the assaults perpetrated in connection with the siege of the

17

Capitol are unique—as the D.C. Circuit has noted "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The government is unaware of any other event of its kind in which scores of assaults of law enforcement officers created a "grave danger" to our democracy itself. Relatedly, Section 3553(a)(6) focuses on comparing defendants who engaged in "similar conduct," but the Capitol siege defendants are categorically unlike others. While assaulting or resisting federal officers or interfering with officers during a civil disorder is serious conduct that warrants prosecution, the January 6 attack on the Capitol is *sui generis*. Capitol siege defendants "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). Capitol siege defendants thus participated in "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021). Section 3553(a)(6) does not require sentencing courts to "avoid sentencing disparities between defendants who might not be similarly situated," and where, as here, the offense is "uniquely serious," the sentencing court may properly opt to "impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768 (D.C. Cir. 2018) (citations omitted).

Second, the cases referenced in defendant's chart (ECF No. 36-5) all relate to violations of 18 U.S.C. § 111(a)(1), or in one case, 18 U.S.C. § 231(a)(3). Mr. Reid was not charged or convicted of either of those offenses – another reason the chart does not provide a relevant comparison between "similarly situated" defendants.

Third, the chart does not provide enough information for a reasoned comparison between cases. Section 3553(a)(6) directs a sentencing court to identify defendants "with similar records," but the chart provides no information about the records of the individuals charged in Portland. Moreover, section 111(a)(1) encompasses both misdemeanor and felony charges, but the chart does not distinguish between the two, making a meaningful comparison to Mr. Reid's felony convictions impossible.

Fourth, Section 3553(a)(6)'s focus on defendants who "have been *found guilty* of similar conduct" also suggests that sentencing courts should compare defendants *convicted* of the same offenses, not defendants who were *charged* with *different* offenses but not found guilty. Comparing a Capitol siege defendants to defendants charged with, but not convicted of, other offenses in other districts is particularly problematic. Among the permissible considerations in deciding whether and how to prosecute a particular case are "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan." *United States v. Armstrong,* 517 U.S. 456, 466 (1996) (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)). None of those prosecutorial decisions, which enjoy a "presumption of regularity," is publicly available, and "in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their duties." *Id.* at 464. Because this information about charging is both publicly unavailable and within the Executive Branch's "broad discretion to enforce the Nation's criminal laws," *id.*, it is not susceptible to comparison with how the government has prosecuted other cases.

In sum, the government submits that defendant's chart is unhelpful, and the proper application of the Sentencing Guidelines is itself the best bulwark against unwarranted sentencing disparities.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:     /s/   Robert Juman
        ROBERT JUMAN
        Assistant United States Attorney
        Bar No. NJ 033201993
        United States Attorney's Office, Detailee
        555 Fourth Street, N.W.
        Washington, DC 20530
        Phone: (786) 514-9990
        E-mail: Robert.juman@usdoj.gov